VOLKER COURT, LLC, and Brent
Lambi, Appellants,

v.

SANTA FE APARTMENTS, LLC,
David Atkins, and Mark
Atkins, Respondents.

No. WD 62763.

Missouri Court of Appeals,
Western District.

Jan. 20, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 2, 2004.

Application for Transfer Denied
April 27, 2004.

Vincent Francis O'Flaherty, Kansas City, for Appellants.

Stewart M. Stein and David W. White, Kansas City, for Respondents.

PAUL M. SPINDEN, Judge.

Believing that one of the members of Santa Fe Apartments, LLC, had breached its agreement to sell an apartment complex to him for $4.6 million and had guaranteed that he could get the other member to agree to the deal, Brent Lambi and his limited liability company sued Santa Fe and its members for breach of contract and fraudulent misrepresentation when Santa Fe initially refused to go through with the sale. The circuit court granted summary judgment for Santa Fe and its members. Lambi and his company appeal.

We affirm the circuit court's summary judgment.

Lambi was the sole owner and member of Volker Court, LLC. The limited liability company owned an apartment complex in Kansas City until, on September 19, 2001, it sold the complex for an $800,000 profit. To defer capital gains taxes, Volker Court entered into an Internal Revenue Service approved exchange agreement. To take advantage of the tax benefit, Volker Court had to identify three possible replacement properties within 45 days of the sale. In fulfillment of the agreement, Volker Court identified the Santa Fe apartments. The record does not indicate anything about any other properties.

On September 26, 2001, county government authorities sold the Santa Fe Apartments in an auction on the courthouse steps. David Atkins, on behalf N.B. Forrest Management, Inc., outbid Volker Court and purchased the complex for $3.9 million. N.B. Forrest later transferred title in the apartment complex by warranty deed to Santa Fe Apartments, LLC. David Atkins and Mark Atkins, brothers, were equal members and managers in Santa Fe.

After the auction, Lambi telephoned David Atkins and asked about buying Santa Fe Apartments, but Atkins refused to sell. Later, Lambi's real estate broker, Aandrea Carter, called Atkins and told him that Lambi was interested in buying the apartments for $4.1 million to $4.2 million. Atkins rejected the offer but solicited Lambi's formal, written offer.

On October 17, 2001, Carter sent Lambi's written offer to Atkins. Lambi offered $4.1 million for the apartments. Atkins rejected the offer. Two days later, Atkins sent Carter a letter, which said:

Thanks for the offers on Santa Fe. I know that you have spent a bit of time on the deal.

Here is my suggestion. Clear[l]y $4.2M isn't nearly enough. Between your sales fee and my closing cost, I'd be out of pocket $200,000 which would mean I'd only net $100,000. After taxes I'd have been better off saving my time and waxing my car.

$4.4M is better, but again with the owner financing you've suggested, it would take me years to recoup my out of pocket expense, let alone realize some cash profit. With that in mind, here is my suggestion:

Price—$4.6M

I'll carry $580,000 @ 10% for 6 years with interest only payments

[Lambi] assumes my $3.9M or provides his own mortgage.

[Lambi] covers all closing cost, except title insurance (I'll pay for that), and pays the balance in cash.

As far as your fee goes, I'd be willing to chip in 1%; perhaps [Lambi] would be willing to pay the rest.

I'm willing to stay in this deal for 6 years as I believe in Santa Fe. I believe in the location and from everything I've witnessed [Lambi] can easily handle the management.

Let me know. I can't guarantee my lender will say yes, but I know they want to keep the loan. I spoke with him this afternoon and he was intrigued. *I also know that this is a deal I can force my partner[, Mark Atkins,] to sign off on.*[1] Keep in mind this deal nets us about $22,000 per month as it is currently configured. I'm willing to give that up for roughly $5,000 per month and participate in the risk.

Bottom line: With some arm twisting [Lambi] gets into this deal for about $200,000 to $300,000 out of pocket. He'll earn that back within 2 years. Everyone wins.

/s/ David

PS. Ball is in your court.

Carter forwarded this letter to Lambi. In response, Lambi requested more information on income and expenses from Atkins, and he provided it.

On October 29, 2001, Atkins sent a letter to Lambi, which said:

It was good to speak with you this afternoon about Santa Fe. I've heard a lot about you and have been very impressed with your real estate business. I'm hoping that we'll have time to meet in the future and compare notes.

Since the very first day I started working on the Santa Fe numbers I realized what an opportunity this property represented. The previous management (prior to Yarco) was clearly out of their league. While Yarco did a much better job, they brought along a lot of management and receivership costs, which should not be applicable to our (yours and mine) type of management. While we have only been there for 20 days, I'm positive I'm right. Based upon the property's history and what we'll do to it, I'm confident that it is a $6M property, within 18 months. Frankly after that, I think the value could go as high as $7 to $8M. I don't know what you do at your other properties, but we are very aggressive with our Utility Bill Back system. Within 24 months I'm confident we'll have 50 to 100% of the units on the Utility Bill Back system which sends the NOI through the roof.

Bottom line (this week);

$4.4M all cash (you take care of Aandrea)

---

1. We added the emphasis.

$4.6M, we'll carry $500,000 at 10% interest only, 5 year balloon (personal guarantees, lawyer stuff, etc ... again you take care of Aandrea)

If you can do one of these two things, we have a deal provided everyone's lawyer and bankers are happy. Keep in mind that I do have a partner and I don't want to ask him if this is OK. What I want to have is a signed, secure contract to stick under his nose. The stronger the contract, the more likely he'll agree. He doesn't want to sell it. What I need to compel him is something in writing.

In all sincerity, the farther we dig into this property, the more we like it. A lot of the skeletons that we feared, are not in the closet after all. We acquired 5 leases just last week and hope to acquire 10 more by the end of next week. The point being that this property is becoming more valuable to us by the week.

Regardless, it has been a pleasure getting to know you a bit better throughout the last couple of weeks and I hope that we are able to work together on a different deal, if we can't come together on Santa Fe.

Lambi responded to Atkins' letter by sending him a certified letter on November 2, 2001, which said:

I hereby accept your offer dated October 29th, 2001, to purchase Santa Fe Apartment Complex located in Kansas City, MO, at 85th and Holmes Road, for 4.6 million dollars, as set out in your written offer dated October 29, 2001. I propose that we close this at the earliest time possible.

David, thank you for help making this happen. Please call me at your earliest convenience to schedule closing.

Atkins telephoned Lambi and told him that they did not have a contract. On November 7, 2001, David Atkins sent Lambi a letter, which said:

I can't understand why you feel you have a contract. I've been negotiating in good faith and have tried to make it amply clear that any offer that you might submit, or that I might suggest would have to be approved by my brother. My suggestions in my letter dated October 29th were simply suggestions.

Atkins told Lambi that he was unable to convince his brother to sell the property "in the mid $4M range" but that he thought he could get him "to accept $4.9M with a $500,000 mortgage with the same terms that [they] had outlined earlier." Atkins closed his letter by reminding Lambi that "all negotiations and any ultimately agreed upon sale contract [would] be subject to and contingent upon the review and approval of my partner and my attorney."

The Atkinses prepared a formal real estate purchase agreement on behalf of Santa Fe setting the sale price at $4.9 million, signed it, and sent it to Lambi. Lambi did not respond. On November 12, 2001, the Atkinses on behalf of Santa Fe delivered another contract to Lambi changing the terms and lowering the sale price to $4.6 million. Lambi did not respond again but, along with Volker Court, sued Santa Fe and the Atkinses for breach of contract and fraudulent misrepresentation. The circuit court granted summary judgment for Santa Fe and the Atkinses, and Lambi and Volker Court appeal.

Lambi and Volker Court assert that the circuit court erred in granting summary judgment for Santa Fe on the claim for breach of contract. They assert that genuine issues of material fact existed as to whether David Atkins' letter of October 29 was a binding offer to sell the apartments to Lambi for $4.6 million. We disagree.

When we review a summary judgment, we consider the evidence in the record in

the light most favorable to the party against whom the circuit court ruled. We endeavor to do this by accepting only inferences in the evidence that favor the party against whom the circuit court ruled. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371, 376 (Mo. banc 1993). Before a circuit court can enter summary judgment, it must determine that the parties are not disputing any genuine issue of material fact and that the party seeking summary judgment is entitled to a judgment as a matter of law. Rule 74.04; *ITT Commercial Finance Corporation,* 854 S.W.2d at 377.

█ Before a plaintiff can establish a breach of contract, he must establish the existence of a contract. *Gateway Exteriors, Inc. v. Suntide Homes, Inc.,* 882 S.W.2d 275, 279 (Mo.App.1994). A contract does not exist without a definite·offer and a "mirror-image" acceptance. *Brown v. Donham,* 900 S.W.2d 630, 633 (Mo. banc 1995). "An offer is made when the offer leads the offeree to reasonably believe that an offer has been made." *Brown Machine v. Hercules, Inc.,* 770 S.W.2d 416, 419 (Mo. App.1989). Restatement (Second) of Contracts, § 24 (1981), defines "offer" as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *See Brown Machine,* 770 S.W.2d at 419. A "manifestation of willingness to enter into a bargain," however, "is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26; *see also* 1 Joseph M. Perillo, Corbin on Contracts § 1.11 (rev. ed.1993). Thus, the parties' negotiations, proposals, or preliminary steps do not constitute a contract. *Kali-*

*vas v. Hauck,* 365 Mo. 923, 290 S.W.2d 94, 101 (1956). Moreover, "[w]hether a contract is made and, if so, what the terms of that contract are, depend upon what is actually said and done and not upon the understanding or supposition of one· of the parties." *Gateway Exteriors,* 882 S.W.2d at 279.

█ Atkins' letter of October 29 was not an offer; it merely was an invitation to Lambi and Volker Court to negotiate further concerning the proposed sale. Atkins said in the letter that his brother's approval was necessary: "Keep in mind that I do have a partner[.] What I want to have is a signed, secure contract to stick under his nose. The stronger the contract, the more likely he'll agree.... What I need to compel him is something in writing." Such statements show that Atkins did not intend to conclude the bargain until he had made a further manifestation of ˙assent because he still had to confer with his brother about the matter. Atkins merely was inviting Lambi to draw up a contract to present to Mark Atkins. The letter informed Lambi that David Atkins would recommend to his brother that they accept an offer on specified terms set forth in a strongly written contract. Without Mark Atkins' approval, Lambi did not have the power to close the contract by his acceptance. The letter made it clear that David Atkins did not have the sole authority to enter the contract on behalf of Santa Fe. David Atkins was not in a position to conclude any bargain given his express limitations of bargaining power. The letter merely was a part of the negotiations or preliminary steps to the formation of a contract.

Lambi and Volker Court assert that David Atkins had the apparent authority to bind Santa Fe based upon statements made by the Atkinses in other transactions with Lambi. In 1997, Lambi entered into a real estate contract with the Atkins Part-

nership for the sale of the Volker Court Apartments. As part of the inspection process, Mark Atkins physically inspected the property, and, during that inspection, told Lambi that he was responsible for operations and that his brother was responsible for the business affairs. After the inspection, David Atkins told Lambi's broker that he was exercising his contractual right to terminate the contract based on the property's unacceptable condition.

The second transaction involved a single telephone conversation in late 1997 or early 1998 in which David Atkins called Lambi to determine whether or not he would be interested in selling his contract rights to Coachlamp Apartments. Lambi said he was not interested, and no further discussions took place on the issue.

In light of David Atkins' letter, Lambi had no right to rely on representations that may have been made by the Atkinses in past transactions. Atkins clearly disclosed to Lambi that he did not have his brother's approval to make a formal offer or contract relating to the sale, and he did not represent that he alone had the authority to bind Santa Fe. Hence, the circuit court did not err in granting summary judgment for Santa Fe on Lambi's and Volker Court's claim of breach of contract.

■ Lambi and Volker Court also assert that the circuit court erred in granting summary judgment on their claim of fraudulent misrepresentation. They assert that genuine issues of material fact exist as to (1) whether or not David Atkins' statement that he would sell the apartments for $4.6 million was a fraudulent misrepresentation, (2) whether or not Mark Atkins had actual and constructive knowledge and participated in David Atkins' misrepresentation that he would sell

the apartments for $4.6 million, and (3) whether or not Santa Fe was vicariously liable for David Atkins' misrepresentation that he would sell the apartments for $4.6 million. We disagree.

■ The elements of fraudulent misrepresentation are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury. *Gast v. Ebert*, 739 S.W.2d 545, 547 (Mo. banc 1987).

■ Lambi and Volker Court assert that in his October 29 letter, David Atkins promised to sell the apartments for $4.6 million although he did not intend to sell the apartments for this amount.[2] "A promise accompanied by a present intent not to perform is a misrepresentation sufficient to constitute fraud." *Carlund Corporation v. Crown Center Redevelopment Corporation*, 910 S.W.2d 273, 279 (Mo.App. 1995). Atkins, however, made no promises in the October 29 letter and, therefore, could not have intended for Lambi and Volker Court to act on his statements. Atkins' assertions did not constitute an offer but were merely an invitation to negotiate further.

Lambi, also, had no right to rely on the alleged representations. In the October 29 letter, Atkins merely was inviting Lambi and Volker Court to make an offer that he could present to Mark Atkins for approval. The letter made clear that Mark Atkins' approval was necessary for any contract. Lambi had no right to rely on representations that may have been made

2. Lambi and Volker Court also argue that David Atkins' October 19 letter also contained a promise to sell the apartments for $4.6 million. Lambi's and Volker Court's petition,

however, cites only the October 29 letter as the basis for their claim that David Atkins promised to sell the apartments for $4.6 million.

by David Atkins in past separate transactions given the specific language of the October 29 letter.

As a matter of law, Lambi and Volker Court could not establish that David Atkins made a false representation, that David Atkins intended for Lambi or Volker Court to act on the representation, or that Lambi had the right to rely upon the representation. To the extent that Lambi and Volker Court alleged that Mark Atkins had actual and constructive knowledge and participated in David Atkins' misrepresentation and that Santa Fe was vicariously liable for David Atkins' misrepresentation, these claims fail for the same reasons. The circuit court, therefore, did not err in granting summary judgment for David Atkins, Mark Atkins, and Santa Fe on the claims for fraudulent misrepresentation.

We affirm the circuit court's judgment.

RONALD R. HOLLIGER, Presiding Judge, and PATRICIA A. BRECKENRIDGE, Judge, concur.