L.L. LEWIS CONSTRUCTION,
L.L.C., Appellant,

v.

Harry ADRIAN and Marge
Adrian, Respondents.

No. WD 62400.

Missouri Court of Appeals,
Western District.

Sept. 7, 2004.

Brian K. Franka, Jefferson City, MO, for appellant.

Audrey Hanson McIntosh, Jefferson City, MO, for respondents.

Before NEWTON, P.J., ULRICH and BRECKENRIDGE, JJ.

PATRICIA BRECKENRIDGE, Judge.

Harry and Marge Adrian entered into an oral contract with L.L. Lewis Construction Company, L.L.C., ("Lewis") for the remodeling of the Adrians' home. The original cost estimate prepared by Lewis for the remodeling was $83,829.78. The total amount billed by Lewis for the renovations to the Adrians' home, however, was $107,090.27. The Adrians paid Lewis $71,908.15 before they became dissatisfied with the construction and stopped paying. Lewis filed suit against the Adrians for breach of contact and sought damages in the amount of $35,182.12. The Adrians filed a counterclaim for breach of contract and "defective workmanship and lack of adequate engineering." Following a bench trial, the trial court entered judgment against Lewis on its breach of contract claim and entered judgment in favor of the Adrians in the amount of $17,550 on their counterclaim for breach of contract. Lewis appeals, claiming that the trial court committed numerous errors. Because Lewis' claims are not meritorious and the trial court properly found that Lewis materially breached the contract, the judgment of the trial court is affirmed.

## Factual and Procedural Background

Sometime before September 1999, Larry Lewis, the managing member of L.L. Lewis Construction Company, met with the Adrians to discuss remodeling the Adrians' two-bedroom ranch-style home in Tebbetts. The Adrians provided Lewis with a picture of a house that they wanted their home to resemble after the remodeling. The Adrians wanted their remodeled home to be their "dream home." One reason the Adrians chose to remodel their existing home rather than build a new home was to save the hardwood floors, which were beautiful and unable to be replaced. The original remodeling plans called for changes to the main floor of the Adrians' existing home and the addition of a second story, which was to include three bedrooms, a hall bathroom, a master bathroom, and a laundry room.

After receiving the picture from the Adrians, Lewis had a floor plan prepared by Fab Building Center, which Lewis presented to the Adrians for their approval. The plan, however, was never approved or sealed by a licensed engineer or architect. After obtaining the Adrians' approval, Lewis prepared a budget, or cost estimate, for the remodeling job based on the original plan. The original cost estimate was for $83,829.78. The Adrians initially agreed to pay Lewis all costs incurred for the remodeling, including labor and materials, plus fifteen percent of these costs. The parties also agreed that Lewis would charge $31.25 per hour for carpenters and $17.50 per hour for laborers. The terms of the agreement, however, were never reduced to writing.

On or about September 13, 1999, Lewis began remodeling the Adrians' home. Following commencement of the construction, the Adrians began making changes to the original set of plans. Some changes, such as the addition of walk-in closets, were required because the original set of plans did not make effective use of space. Other changes included the addition of a dormer over the garage and the addition of a loft. Several deletions were also made to the original plans, including a back deck, kitchen, dining room, and a vault room. The biggest change was the conversion of the planned attic into a third-floor room and the addition of a third-floor dormer. When this change was contem-

plated, Harry Adrian asked Larry Lewis whether the existing structural beam in the house was sufficient to carry the extra weight of the addition and Mr. Lewis assured Mr. Adrian that it was.

Lewis told the Adrians that it would have the renovation completed by Thanksgiving 1999. During November 1999, Lewis did not spend much time working on the project. Throughout the month of December 1999, the Adrians left numerous messages with Lewis, asking Lewis to come out and continue to work on the renovation and correct numerous defects. Sometime after Christmas, after Lewis failed to continue to work on the project and correct the defects, the Adrians told Lewis not to return.

Throughout the construction project, Lewis submitted invoices to the Adrians. The first invoice, for work performed from September 10, 1999, through September 23, 1999, was for $13,292.56. While the Adrians paid Lewis the full amount billed on the first invoice, Larry Lewis and Mr. Adrian thereafter agreed to reduce the percentage of profit on materials from fifteen percent to ten percent. The fifteen percent mark-up on labor was unchanged. The second invoice, for work performed through October 7, 1999, was for $23,705.26. The Adrians paid the second invoice in full. The third invoice, dated November 7, 1999, was for $34,910.33. The Adrians initially paid Lewis $20,000 for the amount billed on the third invoice. On February 1, 2000, the Adrians paid Lewis $14,910.33 for the remaining balance owed on invoice number three. Lewis sent the Adrians several additional invoices; the final invoice, dated June 7, 2000, indicated a final balance owed of $35,182.12. The Adrians, however, made no additional payments to Lewis. Thus, the total amount billed by Lewis was $107,090.27, while the total amount paid by the Adrians was $71,908.15, a difference of $35,182.12.

At the time Lewis stopped working on the renovation, around Thanksgiving, not one room was completed and the Adrians were unable to move into the second floor. In addition, after Lewis stopped working, structural defects in the construction began to be apparent. For example, the weight of the two-floor addition to the existing one-story structure caused a buckling of the floors on the first level. This was evidence that the weight of the addition was too great for the existing support beams and foundation. As a result, the Adrians' hardwood floors began to separate. About every couple of laths, an eighth- to quarter-inch separation was created between the wood laths. The added weight also caused a three-foot long crack in the brick above the garage door, cracks in the ceiling of the living room, and cracks in the tile in the master bathroom.

In addition to structural problems, Lewis' construction was defective in numerous other respects. For example, holes were left exposed in the exterior siding, which led to birds nesting in the wall. Lewis failed to properly vent the dryer, which resulted in condensation and mold building up in an exterior porch ceiling and caused the dryer to malfunction. Carpentry and plumbing in the downstairs bathroom were not properly installed. The fireplace fan motor was excessively noisy, and a ceiling fan was improperly hung. A Quaker window had been scratched and its frame dented by falling bricks. A heating and air conditioning duct above the ceiling in the master bedroom was not insulated and caused condensation, leaks, and moisture damage in the ceiling. Numerous defects also existed with the drywall. In particular, there were cracks in some walls and ceilings, nail pops or staple marks, saw

marks on the third floor, and gaps between the drywall and the trim.

After the parties were unable to resolve their disagreements over the renovation project, Lewis filed a petition for breach of contract seeking damages in the amount of $35,182.12. The Adrians answered and filed a two-count counterclaim, alleging breach of contract and "defective workmanship and lack of adequate engineering." Prior to trial, the Adrians spent $15,310.93 to complete the renovation and correct a few defects. The work done by the Adrians to complete the renovation involved insulation; drywall in the dining and living room; cabinets; interior finish work, such as trim and hardware; installation of a staircase and third floor railing; painting and carpeting of all renovated areas; mirrors; and a sidewalk. Most of the defects were uncorrected at the time of trial.

The case was tried without a jury. On December 17, 2002, the trial court entered its judgment, with findings of fact and conclusions of law, holding that "[t]he construction, with the exception of the framing of the renovation, was not completed in a workmanlike manner," and it was "not possible to completely repair the problems caused by [Lewis'] construction. It also held that Lewis materially breached its contract with the Adrians. Accordingly, the trial court found in favor of the Adrians on Lewis' claim for breach of contract. The trial court also found in favor of the Adrians on the Adrians' counterclaim for breach of contract and awarded the Adrians $17,550. Finally, the trial court held that the Adrians failed to prove damages on their claim for defective workmanship and lack of adequate engineering. Lewis filed this timely appeal.

### Standard of Review

In a court-tried case, this court will affirm the trial court's judgment unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). This court reviews the evidence, along with all reasonable inferences, in the light most favorable to the trial court's judgment and disregards all contrary evidence and inferences. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht,* 25 S.W.3d 530, 534 (Mo.App.2000). As the trier of fact, the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony. *Ken Cucchi Constr., Inc. v. O'Keefe,* 973 S.W.2d 520, 524 (Mo. App.1998).

### Points on Appeal

Lewis raises five points on appeal. First, Lewis asserts that the trial court's judgment against it on its breach of contract claim was against the weight of the evidence because it performed the work renovating the Adrians' home and the Adrians breached the contract by failing to pay Lewis the total amount billed for the materials, labor, and profit expended on the renovation, pursuant to the cost-plus contract. In addition, Lewis contends that, even if it was in breach of the contract, which Lewis disputes, the trial court erroneously declared or applied the law when it did not offset the Adrians' damages with the amount Lewis alleges it is owed. Second, Lewis claims that the trial court's finding that it materially breached the contract was erroneous because the weight of the evidence established that it substantially performed its obligations under the contract and it was unable to complete the renovation project because the Adrians refused to allow it to return to the work site. Thus, Lewis avers the trial court erred in relieving the Adrians of

their obligation to pay Lewis the outstanding balance it is owed pursuant to the terms of the cost-plus contract.

Third, Lewis claims that the trial court erroneously declared and applied the law when it awarded the Adrians the costs associated with additional steel beams and other extra work recommended by the Adrians' expert as necessary to support the weight of the two-story addition. Specifically, Lewis contends that, if the beams had been installed at the beginning of the project, the Adrians would have been responsible for such costs pursuant to the terms of the cost-plus contract. Fourth, Lewis asserts that the trial court erroneously declared and applied the law in its calculation of damages for the cost to repair the drywall when it admitted and relied on the testimony of Mr. Adrian, who was not qualified as an expert. Finally, Lewis contends that the trial court's finding that all of the construction performed by Lewis, with the exception of the framing, was done in an unworkmanlike manner was not supported by substantial evidence and was against the weight of the evidence. Lewis' first, second, and fifth points will be considered first because they specifically relate to the trial court's holding that Lewis materially breached its contract with the Adrians.

### A. Material Breach

■ In its first, second, and fifth points, Lewis argues that it substantially complied with its obligations under the contract and, therefore, the court erred in relieving the Adrians of their obligation to pay Lewis the outstanding balance owed under the parties' oral contract. At a minimum, Lewis contends that any damages suffered by the Adrians resulting from any breach by Lewis should merely offset the Adrians' obligation under the cost-plus contract.

■ In Missouri, strict compliance with the terms of a construction contract is not required, and substantial compliance must be accepted. *Daugherty v. Bruce Realty & Dev., Inc.*, 892 S.W.2d 332, 335 (Mo.App.1995). "[A] building is substantially complete so as to entitle the contractor to the full contract price when it has reached the state of its construction so that it can be put to the use for which it was intended." *Id.* Moreover, a party's performance under a contract is substantial "even though comparatively minor items remain to be furnished or performed to conform to the plans and specifications of the completed building." *Id.* If a breach is not material, the non-breaching party may not cancel the contract, but must pursue other remedies. *Erney v. Freeman*, 84 S.W.3d 529, 535 (Mo.App.2002).

■ On the other hand, a material breach may excuse the other party's performance. *Daugherty*, 892 S.W.2d at 335. Whether a breach is material is a question of fact. *Id.* Section 241 of the RESTATEMENT (SECOND) OF CONTRACTS (1981) identifies five factors deemed significant in deciding whether a breach is material: (1) the amount of the benefit lost to the injured party; (2) the adequacy of compensation to the injured party; (3) the amount of forfeiture by the breaching party; (4) the likelihood that the breaching party will cure; and (5) the breaching party's good faith. *McKnight v. Midwest Eye Inst. of Kansas City, Inc.*, 799 S.W.2d 909, 915 (Mo.App.1990).

■ Before reviewing the evidence relevant to each factor, the court notes that Lewis' arguments in its points relied on utilize evidence that is not in the light most favorable to the trial court's judgment. It ignores the deference that must be given to the trial court's determination of credibility. *Rinderknecht*, 25 S.W.3d at 534. When considering whether a judg-

ment is against the weight of the evidence, an appellate court must consider the trial court's credibility determinations when weighing the evidence. *Id.* Accordingly, this court will consider the evidence, in the proper light, when weighing each factor.

The first factor, the amount of benefit lost by the Adrians, weighs in favor of a finding of material breach. In terms of remodeling their home, the Adrians wanted to create their "dream home," a home that they could live in and be proud of for the rest of their lives. They chose to remodel their existing home rather than build a new home, in part, because they wanted to preserve the hardwood floors in their existing home. Rather than obtaining their "dream home," however, the Adrians were left with a home that was structurally unsound and significantly damaged by the weight of the addition. For example, the added weight of the addition caused a buckling, or downward deflection, of the floors on the first level. The weight of the addition was too great for the existing support beams and foundation. The insufficient support also made the structure unsound, due to excessive displacement of the floor joists of the first floor. The Adrians' hardwood floors, which they sought to preserve, began to separate due to the added weight of the addition. In some places, up to a quarter of an inch separation now exists between the wood laths of the flooring. The added weight also has caused a three-foot long crack in the brick above the garage door, cracks in the ceiling of the living room, and cracks in the tile in the master bathroom. Such structural deficiencies are significant and weigh in favor of a finding of material breach. *See* RESTATEMENT (SECOND) OF CONTRACTS section 241 cmt. b ("In construction contracts, for example, defects affecting structural soundness are ordinarily regarded as particularly significant.").

Moreover, the trial court found that *all* of the construction Lewis performed, with the exception of the framing, was done in an unworkmanlike manner. While the oral contract at issue in this case did not contain an express requirement that Lewis perform the renovation in a skillful and workmanlike manner, Missouri courts imply such a requirement. *Sveum v. J. Mess Plumbing, Inc.,* 965 S.W.2d 924, 926 (Mo.App.1998). Although Lewis argues in its fifth point that the finding that all of the construction, except the framing, was done in an unworkmanlike manner was against the weight of the evidence, this court disagrees.

The Adrians testified extensively regarding defects in the construction as performed by Lewis. For example, improper venting of the dryer through an exterior porch caused condensation and mold within the porch ceiling and caused the dryer to malfunction. Holes were left exposed in the exterior siding, which led to birds nesting in the wall. Lewis' employees left gaps between the drywall and the trim, including holes around light sockets. Numerous other defects existed with the drywall, including cracks in some walls and ceilings, nail pops or staple marks, and saw marks on the third floor. A heating and air conditioning duct above the ceiling in the master bedroom was not insulated and caused condensation, leaks, and moisture damage in the ceiling. Carpentry and plumbing in the downstairs bathroom were not properly installed. Following Lewis' work on the fireplace, the fireplace fan motor made so much noise that a conversation could not be carried on in Adrians' living room while the fan was running, effectively making the fireplace useless. Lewis' employees improperly hung a ceiling fan, and falling bricks caused damage to a window. This court finds this evi-

dence sufficient to support the trial court's finding that Lewis failed to perform the renovation project, with the exception of the framing, in a workmanlike manner. Consequently, the evidence sufficiently demonstrated that the Adrians failed to receive the benefit they expected under the contract and supports the trial court's finding of material breach.

The second factor, the adequacy of compensation, also weighs in favor of a finding of material breach because money damages in this case are inadequate to sufficiently compensate the Adrians for their entire loss. While many of the problems created by Lewis' defective performance were cosmetic and, therefore, compensable by monetary damages, the evidence also demonstrated that the deflection in the wood flooring could not be adequately repaired short of tearing the floors out and starting over. In some places of the Adrians' hardwood flooring, Lewis' work caused up to a quarter of an inch separation between the wood laths of the flooring. The Adrians made the decision to remodel their existing home rather than build a new home, in part, because they wished to preserve their wood floors since the same quality of flooring was unavailable today. Thus, damages will not adequately compensate the Adrians for the loss of their hardwood flooring.

The third factor, the amount of forfeiture by Lewis as the breaching party, also weighs in favor of a finding of material breach. The parties stipulated that the Adrians paid progress payments to Lewis totaling $71,908.15. Thus, potential forfeiture by Lewis is mitigated. *See* RESTATEMENT (SECOND) OF CONTRACTS section 241 cmt. d ("potential forfeiture may be mitigated if the builder ... has already received progress payments under a provision of the contract"). Moreover, while Lewis billed the Adrians a total of $107,090.27, leaving an unpaid balance of $35,182.12, at trial, Lewis was only able to produce receipts and invoices totaling $99,756.13. Some of the items included in these invoices, however, were for other jobs or were not proper expenses under the contract. And, while the contract, here, was a cost-plus contract, the initial cost estimate for the entire remodeling project was $83,829.78. From this original cost estimate, the evidence demonstrated that numerous items were not constructed, for example: a porch, estimated to cost $7,983.91; mirrors, estimated to cost $250; carpet, estimated to cost $2500; labor for painting, estimated to cost $600; and cabinets, estimated to cost $650. Deducting these items results in a total cost estimate of $71,845.87, an amount less than the total paid by the Adrians. While additional items were added to the project, including a dormer, a loft in one bedroom, and a closet, Lewis failed to offer any evidence as to the cost of these additions. Consequently, this court finds that Lewis has failed to prove that any net forfeiture in this case would be significant.

The fourth factor, the likelihood that the breaching party will cure, also weighs in favor of a finding of material breach. While Lewis argues that the Adrians did not allow it an opportunity to cure and refused to allow it to complete the project, the evidence refutes Lewis' argument. In particular, Ms. Adrian testified that before Lewis completely quit working, they had left numerous messages with Lewis, trying to get Lewis to come out and complete parts of the renovation. There was also evidence that the Adrians informed Lewis of numerous problems that Lewis failed to rectify. For example, the Adrians told Lewis about a problem with the ceiling fan that Lewis installed in the living room, yet Lewis failed to fix the problem. The Adrians informed Lewis about the problem with the fireplace motor, yet Lewis failed

to fix the problem. Mr. Adrian also testified that after Lewis was notified of a problem with the dryer vent, a Lewis employee suggested attempting to fix the problem by cutting a hole in the house, which the Adrians refused to let him do. The Adrians also told Lewis about problems with the windows. Mr. Adrian testified that Lewis had a representative from the window company come out to the home to discuss the problem, but Lewis failed to resolve the problem. Thus, the evidence sufficiently supports a finding that the Adrians allowed Lewis an opportunity to cure but, upon Lewis' failure to do so, the Adrians elected to terminate the contract.

The final factor, the extent to which Lewis' behavior comports with standards of good faith and fair dealing, also weighs in favor of a finding of material breach. In discussing *"good faith performance,"* the Restatement defines it as "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms." RESTATEMENT (SECOND) OF CONTRACTS section 205 cmt. d. "[B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." *Id.* The evidence, here, demonstrated that Lewis lacked good faith and fair dealing in its contract with the Adrians. For example, Ms. Adrian testified that some of Lewis' employees would show up unprepared and without the necessary items they needed for the day's projects. She also testified that a couple of the workers would play football, listen to music, and joke around rather than work. Yet, after she informed Lewis of these problems, no improvement occurred. Nor did Lewis properly address problems the Adrians brought to its attention. For instance, when Lewis was told that a light socket was installed on the wrong side of the door, rather than repairing the drywall, Lewis simply put a plate over the

hole when it moved the light switch. Lewis over-billed the Adrians for workers' time, included items on the Adrians' invoices for other jobs, and charged the Adrians for pallet deposits without providing for corresponding credits. Lewis also billed the Adrians for interest, even though no agreement had been made between the parties for the payment of interest. This evidence sufficiently demonstrates that Lewis lacked good faith and fair dealing, as defined by the Restatement.

In sum, each of the five factors deemed significant in determining whether Lewis materially breach its contract with the Adrians weighs in favor of such a finding. Consequently, sufficient evidence supports the trial court's finding that Lewis was in material breach of the contract and the judgment was not against the weight of the evidence. Therefore, because of Lewis' material breach, the Adrians were excused from further performance under the contract. *Daugherty*, 892 S.W.2d at 335. Thus, the trial court did not err in failing to offset the Adrians' damages with any amount the Adrians may have still owed Lewis under the contract. Points one, two, and five are denied.

### B. Cost of Repair Damages

In points three and four, Lewis takes issue with the trial court's calculation of the Adrians' cost of repair damages. First, in point three, Lewis contends that the trial court erred in awarding the Adrians the costs associated with additional steel beams and other extra work recommended by the Adrians' expert as necessary to support the weight of the two-story addition. The Adrians' expert witness, Matthew Marschke, a licensed engineer, testified that the deflection of floor joists, the separation of the wood flooring from those floor joists, separations between the

wood laths of the flooring, and cracks in the brickwork over the garage door, the living room ceiling and tile in the master bathroom were caused by the addition of the second- and third-stories to the structure. Mr. Marschke further testified that he would recommend that the Adrians install additional steel beams, columns, and footings in the basement of the house to stop further deflection of the joists and floors and remediate any safety concerns with the overloading of the floor. Mr. Marschke estimated that it would cost $11,915 to install the additional support structures.

■■■ In point three, Lewis does not challenge Mr. Marschke's estimate. Rather, Lewis argues that because the $11,915 estimate is for additional work, if Lewis would have installed the additional steel beams and supports at the beginning of the construction project, the Adrians would have been responsible for paying for the beams and support structures, pursuant to the cost-plus contract. Therefore, Lewis claims that the $11,915 is not a proper "repair cost" but, rather, an "additional cost" for which Lewis is not responsible.

Mr. Marschke's estimate of $11,915 specifically concerned the addition of steel beams, columns, and footings to the Adrians' home to remediate the problems caused by Lewis' defective construction. In particular, the added weight of the addition caused downward deflection of the floor joists of the first floor of the Adrians' home, which caused the hardwood floors to separate, in some places leaving up to a quarter of an inch separation. A safety issue also has been created due to the excessive displacement of the floor joists. The renovation Lewis undertook was structurally unsound. Consequently, the addition of steel beams and supports for reinforcement purposes is necessary to en-

sure that the Adrians' home is structurally sound and additional deflection does not occur following Lewis' defective construction. As such, the estimate is clearly a repair cost, and the trial court did not err in including the cost of the steel beams in its calculation of the Adrians' damages. *See Ince v. Money's Bldg. & Dev. Inc.*, 135 S.W.3d 475, 479 (Mo.App.2004) (describing two methods of calculating damages in breach of construction cases; one method, the " 'cost of repair,' calculates the cost of repairing the defective work").

Lewis' assertion that the Adrians would have been required to pay for additional structural supports if they had been installed at the beginning of the project is pure speculation. There is no evidence the Adrians would have undertaken a two-story addition if structural concerns had been communicated to them by Lewis at the beginning of the renovation project. Rather than install the additional support, the Adrians could have chosen to forego the third-story room or they could have decided to construct a new home rather than remodel. The second alternative is supported by the opinion of Mr. Marschke that the existing floor joists in the Adrians' home were only marginally adequate for the original one-story structure. Under this circumstance, he would have recommended that the original house be torn down and a new structure built. The trial court did not err in awarding the Adrians damages in the amount of $11,915 for the cost to install the additional beams and support structures, which were necessary to repair the damage caused by Lewis' failure to ensure the structural integrity of the addition. Point three is denied.

■■■ In point four, Lewis argues that the trial court erroneously declared or applied the law in allowing Mr. Adrian to testify that the cost to repair the drywall

was at least $5000, because Mr. Adrian was not qualified to offer such an opinion.[1] Consequently, Lewis claims that the trial court improperly used the $5000 estimate in its damage calculation.

■■■■ Section 490.065, RSMo 2000, sets forth the standard for the admission of expert testimony.[2] *Whitnell v. State*, 129 S.W.3d 409, 413 (Mo.App.2004). In particular, section 490.065.1 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." "Substantial practical experience in the area in which the witness is testifying is a permissible source of expertise." *Emerson Elec. Co. v. Crawford & Co.*, 963 S.W.2d 268, 271 (Mo.App.1997). "If the witness has some qualifications, the testimony may be permitted." *Whitnell*, 129 S.W.3d at 413. "The extent of an expert's training or experience goes to the weight of his testimony and does not render the testimony incompetent." *Id.* The trial court has discretion to determine whether a witness is qualified to testify on certain matters, and the trial court's determination will not be set aside unless that discretion has been abused. *Id.* at 414.

Mr. Adrian's qualifications to give an opinion of the cost to repair the drywall defects in his home were based on his personal experience with drywalling. Mr. Adrian hung drywall in his dining room within the last six previous months. Additionally, Mr. Adrian had experience with drywall from remodeling and repairing homes that he and his wife purchased to either resell or rent. Through this work, Mr. Adrian gained experience in pricing materials. This evidence shows that Mr. Adrian had sufficient "technical or other specialized knowledge" that he could "assist the trier of fact to understand the evidence or to determine a fact in issue" and is sufficient to qualify him as an expert. Section 490.065.1. Thus, the trial court did not abuse its discretion in allowing Mr. Adrian to testify on the cost of drywall repair and relying on his testimony in assessing the Adrians' damages. Point four is denied.

## Conclusion

The trial court's judgment finding Lewis in material breach of its contract with the Adrians for the renovation of their home was supported by substantial evidence and

---

1. In its argument under point four, Lewis also asserts that Mr. Adrian's opinion was not founded on substantial information but, rather, was based on speculation. This argument, however, was not properly raised in Lewis' point relied on and, therefore, is not preserved for appeal. *Banks v. Village Enters., Inc.*, 32 S.W.3d 780, 793 (Mo.App.2000).

2. Section 490.065, RSMo 2000, states:
   1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
   2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
   3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
   4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

was not against the weight of the evidence. Accordingly, the Adrians were excused from further performance under the contract, and the trial court did not misstate or misapply the law when it did not offset the Adrians' damages with the outstanding balance owed Lewis. Finally, the trial court did not erroneously declare or apply the law in calculating the Adrians' damages. Accordingly, the trial court's judgment is affirmed.

All concur.