Andrew Berton PRIDE and Joyce Kay Pride, Respondents,

v.

Larry L. LEWIS, Appellant.

No. WD 65124.

Missouri Court of Appeals, Western District.

Dec. 6, 2005.

Kenneth C. Hensley, Raymore, MO, for Appellant.

Robert E. Sundell, Maryville, MO, for Respondents.

Before ROBERT G. ULRICH, P.J., PATRICIA A. BRECKENRIDGE and JAMES M. SMART, JJ.

ROBERT G. ULRICH, Presiding Judge.

Larry L. Lewis appeals the judgment of the Circuit Court of Nodaway County, Associate Circuit Division, finding that he breached a real estate contract and ordering him to pay damages in the amount of $20,900.00, such sum to bear interest at the rate of nine percent per annum. Mr. Lewis presents three points on appeal. First, he contends the trial court erred in finding a breach of contract because he and his wife were both intended to be parties to the contract but Mrs. Lewis never signed the contract. Second, Mr. Lewis contends the trial court's finding that a contract had been entered into was against the weight of the evidence because the sellers presented a counteroffer, thereby extinguishing Mr. Lewis's offer, and neither Mr. Lewis nor his wife accepted the counteroffer. Finally, Mr. Lewis contends that the trial court erred when it sustained the sellers' objection, based on relevance and the parol evidence rule, to a question asked by Mr. Lewis's counsel's question during trial. Mr. Lewis's second point is granted and the judgment of the trial court is reversed.

## Facts

Andrew and Joyce Kay Pride, husband and wife, owned a house located in Nodaway County. In 2002, they moved to a farm and placed the house for sale with Priority One Realty. The house sat empty for some time; Mr. and Mrs. Pride then found a tenant to rent the house until such time as it sold. The tenant rented the house for a sum of $450 per month.

In April 2003, Mr. and Mrs. Pride were informed that Mr. Lewis made an offer to purchase the house for $55,000, with earnest money in the amount of $1500. During this time, Mr. Lewis was married to Issoline Lewis. The first contract offered by Mr. Lewis through his realtor required Mr. and Mrs. Pride to owner finance the transaction. This offer was rejected by Mr. and Mrs. Pride. Mr. Lewis's realtor then presented a second contract. Mr. and Mrs. Pride's realtor presented them with the second contract, already signed by Mr. Lewis and his realtor. This contract specified conventional bank financing would be used. The contract stated that Mr. and Mrs. Pride were selling the house to Larry and Issoline Lewis. Mr. Lewis signed the contract on April 9, 2003. His realtor also signed the contract, although the date is not indicated. Mrs. Lewis never signed the contract. Mr. and Mrs. Pride, as well as their realtor, signed the real estate contract on April 11, 2003. Upon signing the contract, Mr. and Mrs. Pride informed their tenant that she would have to vacate the house by June 1, 2003. The contract provided by Mr. Lewis had a closing date of May 15, 2003. Mr. and Mrs. Pride changed this date, by hand, to June 1, 2003. This change was initialed by Mr. and Mrs. Pride, but not by Mr. Lewis or Mrs. Lewis.

Mr. and Mrs. Pride became aware that there was a problem with closing on the property in June, when the closing was scheduled to occur. They, along with their realtor, were prepared to close on the property but neither Mr. Lewis, Mrs. Lewis, nor their realtor ever appeared. Mr. and Mrs. Pride's realtor contacted Mr. Lewis's realtor and was informed that Mr. Lewis had not responded to phone calls or otherwise communicated with his realtor. Mr. Lewis testified that he thought "they were going to try to [close] early June, and that's the last I knew." He further testified that he had been travelling and had attempted to contact his real estate agent

a couple of times but, upon not reaching her, "opted to wait and let them contact me." When the closing with Mr. Lewis failed to occur, Mr. and Mrs. Pride sent him a letter notifying him of his default and their electing not to take the $1500 earnest money as damages.

After the closing with Mr. Lewis failed to occur, Mr. and Mrs. Pride re-listed the house with a realtor. Before Mr. Lewis made his offer, the house's listing price had changed several times; when the house was listed again, after the closing with Mr. Lewis failed to occur, the house was listed for $55,000 and the price never changed. The house sold in June 2004 for $40,000. This was the highest offer Mr. and Mrs. Pride received for the house. During the additional year the house was for sale, Mr. and Mrs. Pride were unable to secure another tenant to rent the property.

The two contracts offered by Mr. Lewis and the contract wherein the house actually sold for $40,000 were the only three offers ever made for the property. Mr. and Mrs. Pride's realtor testified that the house may have been worth only $40,000 when the offer for $40,000 was made and the subsequent sale occurred.

Mr. and Mrs. Pride sued Mr. Lewis for breach of contract. They sought damages for the difference between the $55,000 contract price with Mr. Lewis and the $40,000 for which the house actually sold, for the lost rent the year they were unable to find another tenant, and for attorney's fees, as provided in the contract. The trial court entered judgment in favor of Mr. and Mrs. Pride and awarded them $20,900 in damages. No findings of fact or conclusions of law were requested or made and the judgment recites "the Court finds that the allegations in Plaintiff's Petition are true."

Mr. Lewis's timely appeal followed.

## Standard of Review

As set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), the judgment of the trial court will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Spencer Reed Group, Inc. v. Pickett*, 163 S.W.3d 570, 573 (Mo.App. W.D.2005). As neither party requested and the trial court did not make specific findings of fact and law, the trial court is assumed to have made findings consistent with the judgment issued. *Id.* The evidence and all reasonable inferences drawn therefrom will be viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences are disregarded. *L.L. Lewis Constr., L.L.C. v. Adrian*, 142 S.W.3d 255, 259 (Mo.App. W.D.2004). The trial court is the trier of fact and, as such, determines the credibility of witnesses and is free to believe or disbelieve all or part of witness testimony. *Id.*

This court is primarily concerned with the correctness of the result and not the route taken by the trial court to reach that result. *Citibank (South Dakota), N.A. v. Mincks*, 135 S.W.3d 545, 549 (Mo. App. S.D.2004). Because of this, the trial court's judgment will be affirmed under any reasonable theory supported by the evidence. *Spencer Reed Group, Inc.*, 163 S.W.3d at 573. An appellate court will set aside a judgment on the grounds that it is against the weight of the evidence with caution and only with the firm belief that the judgment is wrong. *State ex rel. Nixon v. Alternate Fuels, Inc.*, 158 S.W.3d 811, 813 (Mo.App. S.D.2005). Weight of the evidence refers to the evidence's weight in probative value or its effect in inducing belief, not its quantity. *Austin v. Pickett*, 87 S.W.3d 343, 346–47 (Mo.App.

W.D.2002). Further, the fact that there is evidence of testimony in the record which may have supported a different conclusion than that reached by the trial court does not demonstrate that the judgment is against the weight of the evidence. *Silver Dollar City, Inc. v. Kitsmiller Constr. Co.*, 931 S.W.2d 909, 913 (Mo.App. S.D.1996). An appellate court independently evaluates the trial court's application of the law in determining whether there was a misapplication of the law. *AAA Uniform & Linen Supply, Inc. v. Barefoot, Inc.*, 17 S.W.3d 627, 629 (Mo.App. W.D.2000).

## Analysis

■ As resolution of Mr. Pride's second point is dispositive, it is the only point addressed in this opinion. In his second point on appeal, Mr. Lewis argues that the trial court's finding that a contract had been entered into was against the weight of the evidence. He contends that when Mr. and Mrs. Pride changed the closing date, they made a counteroffer for the sale of the real estate. He further argues that, because neither he nor his wife signed or initialed the change in closing date, he never accepted the counteroffer and thus there was no contract.

■ Before a plaintiff can establish a breach of contract, he or she must first establish the existence of a contract. *Volker Court, LLC v. Santa Fe Apartments, LLC*, 130 S.W.3d 607, 611 (Mo.App. W.D.2004). "A contract does not exist without a definite offer and a 'mirror-image' acceptance." *Id.* Any acceptance that includes new or variant terms from the offer presented amounts to a counter-offer and a rejection of the original offer. *Tirmenstein v. Cent. States Basement & Found. Repair, Inc.*, 148 S.W.3d 849, 851 (Mo.App. E.D.2004); *Tower Props. Co. v. Allen*, 33 S.W.3d 684, 688 (Mo.App. W.D. 2000). The unequivocal acceptance of the offer is fundamental to the existence of a contract. *Medicine Shoppe Int'l., Inc. v. J-Pral Corp.*, 662 S.W.2d 263, 269 (Mo. App. E.D.1983).

Mr. Lewis contends that Mr. and Mrs. Pride made a counteroffer when they changed the closing date from May 15, 2003, to June 1, 2003. While both Mr. and Mrs. Pride initialed this change, it was undisputed at trial that neither Mr. nor Mrs. Lewis initialed the change to the contract. Mr. and Mrs. Pride acknowledge that changing the closing date amounted to a counteroffer.

■ The question is, was the counteroffer ever accepted? Mr. Lewis argues that he never accepted this counteroffer, and, thus, there was no contract. Mr. and Mrs. Pride argue that Mr. Lewis accepted their counteroffer through his conduct and failure to act. They specifically list three facts that manifest Mr. Lewis's acceptance of their counteroffer. They are: (1) Mr. Lewis never contacted his real estate agent, Mr. or Mrs. Pride, the Pride's real estate agent, or anyone else to reject the counteroffer; (2) Mr. Lewis knew the closing was to take place in early June; and (3) Mr. Lewis never sought the return of his earnest money.

■ As a general rule, silence or inaction cannot constitute acceptance of an offer. *E.A.U., Inc. v. R. Webbe Corp.*, 794 S.W.2d 679, 686 (Mo.App. E.D.1990); *Bestor v. Am. Nat'l. Stores, Inc.*, 691 S.W.2d 384, 388 (Mo.App. E.D.1985). Absent a duty to speak, silence may not be translated into acceptance merely because the offeror attaches that effect to it. *Bestor*, 691 S.W.2d at 388. Inaction or silence does not evidence any intention of the offeree. *Id.*

■ This general rule does have exceptions, however. Acceptance of an offer or counteroffer does not always have to be

made through explicit spoken or written word. *Citibank (South Dakota), N.A. v. Wilson,* 160 S.W.3d 810, 813 (Mo.App. W.D.2005). An offer may be accepted by conduct or failure to act. *Id.* This is the rule of law upon which Mr. and Mrs. Pride rely. They claim that Mr. Lewis's conduct and failure to act amount to an acceptance of their counteroffer. While this statement of the law is accurate, it is of no avail in this case. This rule applies primarily to instances where services are rendered and the party benefited by the services is aware of the terms upon which the services are offered. *Id.* "If this party receives the benefit of the services in silence, when there was a reasonable opportunity to reject them, this party is manifesting assent to the terms proposed and thus accepts the offer." *Id.* (internal citations and quote marks omitted). *See also Moore v. Kuehn,* 602 S.W.2d 713, 718 (Mo. App. E.D.1980)(stating that an offer may be accepted through conduct "[w]here the offeree with reasonable opportunity to reject offered goods or services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation."). These cases involve benefits or services being conferred or actions taken in accordance with the proposed agreement in such a manner that the other party is justified in assuming the offer has been accepted. *See, e.g., Wilson,* 160 S.W.3d at 813 (finding acceptance of offer when credit card company mailed patron a revised agreement, patron was informed that the revised agreement was binding unless she cancelled her account within thirty days and did not use her credit card, and patron continued to use her credit card thus manifesting her acceptance of the revised agreement); *E.A.U., Inc.,* 794 S.W.2d at 686 (finding acceptance of offer where offeree referred offeror to third party for third party's approval of change,

where offeree indicated it would be agreeable to any change authorized by third party, and where offeror notified offeree it had obtained third party's approval and offeree failed to reject the change); *Medicine Shoppe Int'l. Inc.,* 662 S.W.2d at 271 (finding acceptance of license agreement when company filled orders for pharmaceuticals and accepted royalty payment in accord with the terms of the license agreement).

The case relied upon by Mr. and Mrs. Pride for the rule of law that conduct may amount to acceptance of an offer is *Environmental Waste Management, Inc. v. Industrial Excavating & Equipment, Inc.,* 981 S.W.2d 607, 612 (Mo.App. W.D.1998). This case is similar to the above examples in that the offeree received the benefit of services in silence, knowing the terms upon which they were offered and having the opportunity to decline the services, and thus was deemed to have accepted the terms of the offer. *Id.* In *Environmental Waste Management, Inc.,* the plaintiff sent the defendant a letter wherein its prices for contaminated soil removal were listed. The defendant allowed the plaintiff to remove contaminated soil, but then refused to pay the prices listed in the letter. The plaintiff subsequently sued for breach of contract and the court held that, by allowing the plaintiff to remove the contaminated soil, the defendant accepted the offer in the letter. *Id.*

Mr. and Mrs. Pride advance the similarity of this case. Mr. Lewis did not accept services or benefits under the terms of an agreement and later claim never to have accepted the agreement. This case is not analogous. As noted, *supra,* Mr. Lewis had no duty to reject the counteroffer. Further, while Mr. Lewis failed to request the refund of his earnest money, this is not sufficient to create a binding contract. Mr. and Mrs. Pride argue that: "Logic

would indicate that a person would desire the return of their earnest money if they believed that no contract had ever been in existence." Maybe so; but almost no testimony regarding this was presented at trial. Mr. Lewis may have believed that the earnest money was nonrefundable. Perhaps he did not want to encounter the hostility of having it refunded. Whatever his reason, the fact that he failed to request the return of the earnest money does not make this case one where Mr. Lewis received a benefit or services under a proposed agreement.

The last evidence Mr. and Mrs. Pride advance as indicative of Mr. Lewis's acceptance of the counteroffer is the fact that he was aware the closing date was in early June. While this certainly weighs in favor of Mr. and Mrs. Pride, it is not sufficient for the trial court to find that Mr. Lewis had accepted the counteroffer resulting in a binding contract. *See, e.g., Tower Props. Co.*, 33 S.W.3d at 688 (finding no acceptance of counteroffer when offeree took no action in response to counteroffer, even though offeree received counteroffer and was fully aware of its terms).

Mr. Lewis could have been clearer with respect to the fact that he was rejecting the counteroffer. He may have known that Mr. and Mrs. Pride assumed their counteroffer had been accepted and were proceeding accordingly. Perhaps as a courtesy he should have informed Mr. and Mrs. Pride that he did not accept their counteroffer. Regardless of whether he breached cultural mores, Mr. Lewis had no legal duty to act or explicitly reject the counteroffer. Mr. and Mrs. Pride erroneously assumed that silence was equivalent to acceptance. This case does not fit with the line of cases holding that an offeree's conduct or failure to act amounted to acceptance of an offer. Mr. and Mrs. Pride should have secured Mr. Lewis's acceptance to the counteroffer before advancing the transaction. This court can not create a contract where one did not exist, especially given the importance of an "unequivocal acceptance of the offer." *Medicine Shoppe Int'l., Inc.*, 662 S.W.2d at 269.

## Conclusion

Mr. and Mrs. Pride made a counteroffer when they changed the closing date in the real estate sales contract. Because the counteroffer was never accepted by Mr. or Mrs. Lewis, a contract was never formed. The judgment of the trial court is reversed.

All concur.