**CRESTWOOD SHOPS, L.L.C.,**
Respondent,

v.

**Sally HILKENE and Churchill in Crestwood, L.L.C.,**
Appellants.

**No. WD 65694.**

Missouri Court of Appeals,
Western District.

Aug. 8, 2006.

Lisa A. Padden Weixelman, Kansas City, MO, Attorney for Appellants.

Stephen J. Torline, Kansas City, MO, Attorney for Respondent.

Before JOSEPH M. ELLIS, P.J., ROBERT G. ULRICH, and RONALD R. HOLLIGER, JJ.

ROBERT G. ULRICH, Judge.

Sally Hilkene and Churchill in Crestwood, L.L.C. (Churchill), owned by Ms. Hilkene, appeal the "Partial Judgment for Declaratory Judgment and Injunction" entered by the Jackson County Circuit Court in favor of Crestwood Shops, L.L.C. (Crestwood). The judgment found that a lease between Churchill and Ms. Hilkene, lessees, and Crestwood, lessor, was validly terminated and no longer legally in effect. Five points are presented on appeal. First, Ms. Hilkene argues that Crestwood did not accept her offer to rescind a lease because the acceptance was not a mirror image of the offer.[1] Second, she argues that Crestwood could not rescind the lease because it was in breach of the lease. Third, she argues that the offer to rescind the lease did not comply with the Statute of Frauds. Fourth, she argues that an offer to rescind the lease had not been made. Finally, she argues that Crestwood could not have accepted the offer to rescind the lease because the offer was made subject to a condition precedent, which the trial court failed to find had occurred prior to the purported acceptance. The judgment is affirmed.

### Facts

Ms. Hilkene is the owner of Churchill, a store selling accessories, jewelry, hand-

1. Ms. Hilkene was sole owner and officer of Churchill in Crestwood, L.L.C., and during all relevant events acted for and on behalf of the corporation and herself.

bags, fashion clothing, interior design items, and home gifts. Churchill has operated a retail store since December 2003, in a shopping center owned by Crestwood. The shopping center is located in Kansas City, Missouri.

Churchill has been a successful business, and, as a result, outgrew its space and requested that Crestwood lease it any additional retail space when space became available. In December 2004, Crestwood offered to lease Churchill adjacent space in the same shopping center. The space was then occupied by a bookstore. Ms. Hilkene, as sole owner and officer of Churchill, executed a lease (Lease) with Crestwood for this additional space (Leased Space) on December 15, 2004, retained by Crestwood, unsigned by it.

Subsequently, the bookstore entered into a lease termination agreement with Crestwood. Pursuant to this agreement, the bookstore agreed to terminate its lease with Crestwood and surrender the space by February 28, 2005. Crestwood signed the Lease with Churchill on January 28, 2005. Churchill's Lease was to commence March 1, 2005.

Over a period of a couple months, the relationship between Ms. Hilkene and Crestwood deteriorated because of three primary sources of contention. Ms. Hilkene asserted to Crestwood that the condition of the newly leased premises was unsatisfactory because of the presence of mold, a faulty foundation due to leaking water, and a defective HVAC system. Prior to taking possession of the Leased Space, Ms. Hilkene discovered damage to the foundation in the basement because of a prior leak and the presence of mold in the basement. She also became aware that the HVAC system needed to be replaced. Ms. Hilkene had other complaints about the Leased Space, including, among other things, that the bookstore had per-

mitted an adjacent tenant to partition off and use portions of the Leased Space, that the Leased Space did not have a restroom or fire escape, and that the awnings were removed from the exterior of the Leased Space. The primary issues, however, were the mold, foundation, and HVAC system. Ms. Hilkene informed Scott Padon, Crestwood's property manager, of these problems. When Ms. Hilkene took possession of the Lease Space on March 1, 2005, the problems had not yet been cured.

A series of conversations, emails, and letters between Ms. Hilkene, Mr. Padon, and other agents of Crestwood regarding the problems and their resolution commenced shortly after Ms. Hilkene discovered them. Ms. Hilkene desired to have the problems resolved quickly because she had a contractor waiting to renovate the interior of the Leased Space so that the second store location could open for business. Crestwood had a policy of requiring three bids if work would cost more than $2,500 and began the process of securing bids for the mold abatement. Crestwood also commenced steps to remedy the foundation damage and faulty HVAC system. In addition, Ms. Hilkene was required to submit to Crestwood her plans for renovating the Leased Space so that Crestwood could approve them. She failed to submit her plans to the satisfaction of Crestwood.

As the interaction between Ms. Hilkene and Crestwood became more contentious, both parties manifested a desire to communicate with the other party only in writing. In a certified letter addressed to Ms. Hilkene and dated March 15, 2005, Mr. Scott Padon, acting for Crestwood, addressed several issues, including Ms. Hilkene's planned improvements to the Leased Space, installation of a fire exit door, demising walls, and various outdoor design de-

tails. The letter did not address the mold, foundation, or HVAC system.

Ms. Hilkene received the certified letter from Mr. Padon on March 17, 2005. She became frustrated from the delay that resulted from sending the letter certified and from the letter's failure to address the mold, foundation, or HVAC system. Ms. Hilkene conveyed her frustration by making numerous handwritten notes on the letter and faxing the letter, with the notes, to Mr. Padon. One of the handwritten notes was the following:

> IF THERE ARE CONTINUED DELAYS & IGNORING IMP. FACTS IN THESE LETTERS I CAN RELEASE MYSELF FROM THIS LEASE AS OF 3–22–05.

Also on March 17, 2005, Ms. Hilkene exchanged a series of email with Todd Miller, a friend and Churchill employee. Mr. Miller is also the son of Kaye Miller, one of the owners of Crestwood. The first email, at 12:45 p.m., reported that Churchill was closed because of her brother's death.[2] Mr. Miller responded at 12:56 p.m. and inquired if he could be of assistance. Ms. Hilkene responded at 3:24 p.m. as follows:

> You can help me by killing scott padon and the landlords.
>
> I want out of that f. . . . . g lease.
>
> I received a certified letter that was so unprofessional and missing important issues that should have been in the letter. Just wasting time. The owners are idiots because they will lose the best builder in town to improve their space. They've dicked us around for almost a month. He can't do the job if he can't start on Monday. So I will get out of

the lease if he's not doing it. Hell, the things they let shawver[3] get away with, like selling erotica in th [sic] basement!

> I feel they are harassing me over petty stuff. They know what Churchill is. The new space will be a better one, but I don't want to be there anymore. It's petty and unprofessional they way the have treated me and Andy.[4]
>
> Luckily, I have enough legal ways to leave.
>
> Let them find someone else who will put the money into crestwood like I have. Good luck finding someone that stupid.

At 3:50 p.m. on March 17, 2005, Ms. Hilkene sent the following email to Mr. Padon:

> Dear Scott,
>
> I have faxed to you at 3:14 p.m. Today [sic] a response to your certified letter. We have wasted 2 days due to your sending a certified letter. And the letter did not address the most pertinent points, mold, water, and hvac. How could I sign such an incomplete letter? Please rewrite the letter, being thorough and specific (what is the design of the door? Is it per the one george instructed andy to draw and I included with my plans? Will it accommodate large furniture?) How will mold and water be addressed and eradicated? Are they doing what you said they would do on the hvac? While they are resolving these issues, they should excuse me of all rent expenses.
>
> *I wish to release myself from the lease by March 24th, if the owners can't resolve the issues which cause concern for myself, andy fritzel, and my workers.*

---

**2.** Ms. Hilkene's brother died on approximately March 15, 2005.

**3.** Shawver refers to the proprietor of the bookstore, the former tenant.

**4.** Andy Fritzel is the contractor Ms. Hilkene hired to renovate the Leased Space.

*More specifically the stachybotris[5] present in the space. Also, Andy's schedule will not permit him to do the space after April 1. I would not have leased the space without his involvement.*

Also, my exterior signage will be like Bloomsday.[6] Where he had his logo, I will have mine. I can get you a drawing next week, but this is petty to hold up the construction inside. Also, an awning to match aixois [7] with "churchill" on it. Please include in the letter that any improvements, approved by owners, but paid for by me will be my property to take upon leaving.

The exterior lanterns are a safety hazard for people walking to aixois. I liked Jim's idea to have a hanging lantern, similar to george's bracket, that would be high enough to not hurt anyone.

The door stain that is existing is what I thought the space would have. New door would match it.

This entire process should have been reviewed with me prior to March 1. This has been an ordeal for both myself and andy fritzel. It is unfortunate that the owners and leasing agents couldn't have been more professional in these specifics prior to the commencement of this lease. I will be on email only. I will be at the store briefly on Friday, but have family commitments through the weekend and monday.

If you send another certified letter, please copy on email so more time is not wasted,

Sally

(emphasis added).

Ms. Hilkene emailed Mr. Padon again on March 18, 2005. In this email, she in-quired whether he received her fax and advised him that he · could contact her through email if he had questions. That same day, Crestwood, though its attorneys, wrote the following letter to Ms. Hilkene:

Dear Sally:

Crestwood Shops, LLC is in receipt of your email correspondence to Scott Padon, Senior Property Manager and Agent for Crestwood Shops, LLC, dated March 17, 2005 (sent at 3:50 p.m.) wherein you indicate your request to be released from the lease of the space located at 301 East 55th Street by March 24, 2005.

Crestwood Shops, LLC hereby honors and accepts your request and both parties shall be released from any and all obligations to the other as of March 24, 2005. The existing lease between the parties for the space located at 309 East 55th Street shall remain unaffected hereby.

Further correspondence was exchanged between the parties wherein ·it was clear that Crestwood considered the Lease to be terminated while Ms. Hilkene considered the Lease to still be effective.

Churchill filed a declaratory judgment action on April 7, 2005, seeking a declaration that the Lease had not been terminated. Crestwood filed its petition on April 8, 2005, seeking a declaration that the Lease had been terminated. The petitions were consolidated, and trial was had on May 11, 2005. The court's "Partial Judgment for Declaratory Judgment and Injunction" was entered on June 1, 2005. The trial court explicitly found a portion of Ms.

**5.** This is the variety of mold found in the basement of the Leased Space.

**6.** Bloomsday is the former tenant, the bookstore.

**7.** Aixois is a neighboring business.

Hilkene's testimony regarding whether she read the Lease not credible. It made the following relevant findings of fact:

In February and early March 2005, Ms. Hilkene raised a number of complaints to Crestwood regarding the foundation, mold remediation, and HVAC system.

There was no evidence Ms. Hilkene obtained inspections of the foundation or mold by a "qualified inspector," as required by the Lease.

No party ever proposed an abatement plan regarding the mold.

Ms. Hilkene created a barrage of email demands and inquiries, directed at Mr. Padon.

Mr. Padon knew of Ms. Hilkene's complaints and was required to obtain three bids for the mold abatement work.

By March 14, 2005, Mr. Padon still did not have a mold abatement plan in place and was unable to provide a timetable to Ms. Hilkene.

The mold was remediated by April 6, 2005.

There was no credible evidence that the foundation problems interfered with Ms. Hilkene's use or improvement of the Leased Space.

There was credible evidence that Crestwood was in the process of contracting for work to the foundation.

The last water damage occurred in August 2004, and there was no credible evidence that there was a water or foundation problem that, in March 2005, caused any threat of immediate damage or impairment of Ms. Hilkene's use of the Leased Space.

There was no credible evidence that the remediation of the mold problem interfered with Ms. Hilkene's ability to continue with her improvements, construction, or modification of the Leased Space.

There was no credible evidence that the presence of mold in the basement caused any delay in Ms. Hilkene's construction plans for the Leased Space. Crestwood's failure to obtain full mold remediation on or before March 17, 2005, did not amount to a material or substantial breach of the Lease.

On March 17, 2005, Ms. Hilkene sent an email to Mr. Padon containing the following offer:

I wish to release myself from the lease by March 24th, if the owners can't resolve the issues which cause concern for myself, andy fritzel, and my workers. More specifically the stachybotris present in the space. Also, Andy's schedule will not permit him to do the space after April 1. I would not have leased the space without his involvement.

Ms. Hilkene complained that Mr. Padon had sent a certified letter, thus wasting time, and stated that she preferred to have all communication made in writing. She established a clear pattern and preference for communicating with Mr. Padon by email.

Both parties agreed to conduct transactions by electronic means. Based on the context and surrounding circumstances, the parties were in full agreement on their intention to conduct transactions by email.

Ms. Hilkene's clear intention on March 17, 2005, was to get out of her lease obligations for the Leased Space. This intention is evidenced by her email to Mr. Padon in which she made the offer, by her email to Mr. Miller, and by her handwritten comments on Mr. Padon's March 15, 2005, letter.

Ms. Hilkene's testimony that she did not intend her email of March 17, 2005, to Mr. Padon, to be an offer to terminate the lease is found to lack credibility. There is credible evidence that she did

intend to void the lease, and that it was her clear intention to do so on March 17, 2005, when she sent her email to Mr. Padon.

Crestwood accepted Ms. Hilkene's offer and returned her deposit and first month's rent.

The judgment made the following relevant conclusions of law:

Crestwood could reasonably believe that Ms. Hilkene's email of March 17, 2005, constituted an offer to terminate the Lease if Crestwood could not fulfill her demands by March 24, 2005. They made a timely and valid acceptance of Ms. Hilkene's offer. The acceptance of Ms. Hilkene's offer to terminate the lease effective March 24, 2005, constitutes a mirror image of her offer. This completed a valid contract.

Even if Crestwood was in breach of the Lease, this would not impede Ms. Hilkene's ability to make a valid offer to terminate the Lease. She had the legal capacity to make such an offer on behalf of Churchill and she did so.

The offer conveyed by email, and the acceptance conveyed by certified mail, constituted a valid contract to terminate the lease. The two documents satisfy the requirements of the Statute of Frauds.

The March 17, 2005, email from Ms. Hilkene to Mr. Padon satisfied the requirements of the Uniform Electronic Transactions Act. Ms. Hilkene's email was a valid written offer.

The judgment decreed that the Lease was no longer legally in effect, and it was validly terminated.

Thereafter, Churchill, Ms. Hilkene, and Crestwood jointly dismissed all remaining claims, making the judgment final. Churchill and Ms. Hilkene's timely notice of appeal followed.

## Standard of Review

In a court-tried case, the judgment of the trial court will be affirmed unless no substantial evidence supports it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Martin v. Reed,* 147 S.W.3d 860, 861 (Mo.App. S.D.2004)(citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). The trial court's judgment will be set aside only with a firm belief that the judgment is wrong. *McRentals, Inc. v. Barber,* 62 S.W.3d 684, 696 (Mo.App. W.D. 2001). All evidence and inferences favorable to the judgment are accepted as true, while all contrary evidence and inferences are disregarded. *Martin,* 147 S.W.3d at 861. Deference is given to the trial court's findings regarding witness credibility and the trial court is free to believe or disbelieve all or part of the witnesses' testimony. *Id; McRentals, Inc.,* 62 S.W.3d at 696. Deference is also given to a trial court's findings of fact. *In re Estate of Moore,* 136 S.W.3d 163, 164 (Mo.App. S.D. 2004). Interpretation of a contract is a question of law and is subject to *de novo* review. *Local 781 Int'l. Ass'n of Firefighters v. City of Independence,* 996 S.W.2d 112, 115 (Mo.App. W.D.1999). When interpreting a contract, the overriding concern of the appellate court is to give effect to the intentions of the parties. *Id.*

## Point I

In the first point relied on, Churchill and Ms. Hilkene argue that the trial court erred in concluding that the March 18, 2005, letter from Crestwood constituted an acceptance of an offer to rescind the Lease. They assert that the trial court erroneously applied the law because the purported acceptance did not mirror the terms of the alleged offer.

The existence of a contract requires both an offer and acceptance. *Walker v. Rogers*, 182 S.W.3d 761, 768 (Mo.App. W.D.2006). Acceptance must be unequivocal and a "mirror-image" of the offer. *Id.* An acceptance that includes new or variant terms from the offer presented is a rejection of the original offer and a counter-offer. *Pride v. Lewis*, 179 S.W.3d 375, 379 (Mo.App. W.D.2005). A determination of whether an offer has been accepted depends upon what is actually said and done; it does not depend on the understanding or supposition of one of the parties. *Walker*, 182 S.W.3d at 768.

In her March 17, 2005, email, Ms. Hilkene stated: "I wish to release myself from the lease by March 24th, if the owners can't resolve the issues which cause concern for myself, andy fritzel, and my workers." The trial court found that this language was Ms. Hilkene's offer to terminate the Lease. In response to this email, Crestwood sent Ms. Hilkene a certified letter on March 18, 2005; the letter stated:[8] "Crestwood Shops, LLC hereby honors and accepts your request and both parties shall be released from any and all obligations to the other as of March 24, 2005." Ms. Hilkene contends that the acceptance is not a mirror image of the offer and, thus, that it is really a counteroffer, and there was no agreement to rescind the Lease.

She asserts that her March 17, 2005, email only offered to release herself and Churchill from the Lease. It did not, she claims, offer to terminate the Lease or mutually release all of the parties from their responsibilities under the Lease. She asserts that the offer was to release

herself from the Lease, not to rescind, void, or mutually release all parties from the Lease.

In *Woods ex rel. Woods v. Cory*, 192 S.W.3d 450, 459–60, (Mo.App. S.D. 2006), the defendant claimed that the language of acceptance introduced new or variant terms from the language of the offer and was, thus, a rejection and counter-offer. The language of the offer was to pay "$35,000.00 to settle all cases and claims." *Id.* at 460. The language of the acceptance was to "settle all matters connected with these cases for $17,5000.00 to each case." *Id.* The appellate court found that defendant's claim was without merit. *Id.* It stated that it "is undisputed that Defendant offered to pay $35,000.00 to settle the two claims and Plaintiffs accepted $35,000.00 to settle both claims." *Id.* Thus, *Woods* teaches that the language used to extend and accept an offer does not have to be identical in order for a valid contract to result. Instead, the acceptance must not change the terms of the offer.

Ms. Hilkene argues that Crestwood's acceptance was more than merely using different words to accept the offer. Instead, she asserts it changed the terms of the offer. She relies primarily upon *Pride v. Lewis*, 179 S.W.3d 375 (Mo.App. W.D. 2005). In *Pride*, a potential homebuyer made an offer to purchase a home, with closing to take place on a certain date. *Id.* at 377. The sellers accepted the offer, but changed the closing date in the contract. *Id.* The sellers admitted that changing the closing date converted the acceptance into a counter-offer because the terms of the

offer, namely the closing date, had been changed. *Id.* at 379. This court found that the buyer never accepted the counter-offer, and a valid contract did not result. *Id.* at 381.

Ms. Hilkene uses a definition, first asserted by Crestwood, that the term "release" indicates a desire to "terminate all of his/her rights and obligations under the agreement." She states that this definition does not encompass terminating the other party's obligations under the agreement. Ms. Hilkene's argument is logically flawed. The Lease was between Churchill and Ms. Hilkene as lessors and Crestwood as lessees. According to Ms. Hilkene's argument, her email was an offer to release both herself and Churchill, of which she is the sole shareholder and officer, from the Lease. She was offering, per her endorsement of Crestwood's definition of release, to terminate all of her rights and obligations under the Lease. Thus, she and Churchill would no longer be a party to the Lease, as they would have neither rights nor obligations under the Lease. Applying Ms. Hilkene's analysis, this would leave Crestwood as the sole party to the Lease. Crestwood would be a lessor without a lessee. It would have rights, but no party against whom to enforce them. It would have obligations, but no party to whom they were owed. If Ms. Hilkene's offer was to terminate all of her and Churchill's rights and obligations under the Lease, it was also an offer to terminate Crestwood's rights and obligations under the Lease as Crestwood could not remain the sole party to the Lease. The effect was to terminate the Lease entirely. When Crestwood accepted Ms. Hilkene's offer, it merely stated this fact. It did not change or add terms to the offer; it restated the offer and clarified the effect of releasing Ms. Hilkene and Churchill from the Lease. Crestwood's acceptance was a valid acceptance; it was not a counter-offer.

Point denied.

## Point II

In the second point relied on, Churchill and Ms. Hilkene argue that the trial court erred in concluding that Crestwood could rescind the Lease. They assert that the trial court erroneously declared and applied the law because Crestwood had already breached the Lease. They rely upon the rule that a party who has committed a contractual breach cannot later rescind the contract. *Meyer Mill. Co. v. Baker,* 328 Mo. 1246, 43 S.W.2d 794, 796–97 (1931); *Landau v. St. Louis Pub. Serv. Co.,* 364 Mo. 1134, 273 S.W.2d 255, 257–58 (1954).

The trial court made the following relevant finding:

Even if Crestwood was in breach of the Lease, this would not impede Ms. Hilkene's ability to make a valid offer to terminate the Lease. She had the legal capacity to make such an offer on behalf of Churchill and she did so.

In essence, Ms. Hilkene argues that this finding is incorrect. She relies on *Meyer Milling Co. v. Baker,* 328 Mo. 1246, 43 S.W.2d 794, 796–97 (1931), and *Landau v. St. Louis Public Service Co.,* 364 Mo. 1134, 273 S.W.2d 255, 257–58 (1954), for support of her claim. These two cases involved a defendant that breached a contract and then attempted to unilaterally terminate the contract. The cases are distinguishable from the case sub judice. A mutual agreement to terminate the contracts did not exist in either of the two cases as the trial court found occurred in this case. Ms. Hilkene cites the following language from *Landau* in support of her assertion:

However, even if defendant's action in mailing out this form of release could be

construed as the manifestation of an intention to repudiate or breach the contract, the trouble with plaintiff's position is that she had first breached it. "[A] party who has himself been guilty of the first substantial breach of contract cannot rescind the contract because of subsequent refusal or failure to perform by the other party."

273 S.W.2d at 258 (citation omitted). This language illustrates that a party who has breached a contract may not unilaterally choose to rescind the contract. In this case, Crestwood did not unilaterally rescind the Lease. Ms. Hilkene made an offer, and Crestwood accepted the offer. Thus, even if Crestwood were in breach of the Lease, which is not decided, it was not prevented from accepting Ms. Hilkene's offer to terminate the Lease. The trial court's finding was correct.

Point denied.

### Point III

█ In the third point relied on, Churchill and Ms. Hilkene argue that the trial court erred in concluding that Ms. Hilkene's March 17, 2005, email satisfied the Statute of Frauds as a signed writing. They assert that the trial court erroneously applied the law because the parties had not agreed to conduct Lease transactions by electronic means.

█ None of the parties dispute that because the Lease was for a term of five years, it was within the purview of the Statute of Frauds. §§ 432.010, 432.060.[9] Thus, like the Lease itself, the termination of the Lease must also be in writing to comport with the Statute of Frauds. *Id.*

This is also not disputed by the parties. The trial court relied upon the Uniform Electronic Transactions Act (UETA), section 432.200 *et seq.*,[10] to conclude that Ms. Hilkene's March 17, 2005, email to Crestwood was a signed writing comporting with the Statute of Frauds. The UETA gives legal effect to contracts formed by electronic record, but its application is limited to transactions where all the parties to the agreement have agreed to conduct transactions by electronic means. § 432.220.2. Section 432.220.2 states:

> Sections 432.200 to 432.295 apply only to transactions between parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct.

Ms. Hilkene argues in this third point that her March 17, 2005, email does not qualify as a signed document under the Statute of Frauds because the parties did not agree to conduct transactions by electronic means. She relies on the following Lease provisions:

> Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises for a term ... commencing on the Commencement Date and ending on the Expiration Date set forth in Article 1, unless sooner terminated as provided herein ...[11]
>
> ... Except as otherwise expressly provided herein, no subsequent alteration, amendment, change or addition to this Lease, nor any surrender of the Premises, shall be binding upon Landlord or

---

9. All statutory references are to RSMo 2000 unless otherwise stated.

10. All references to the Uniform Electronic Transactions Act are to RSMo Cum.Supp. 2003 unless otherwise stated.

11. This provision is located in Article 3 of the Lease.

Tenant unless reduced to writing and signed by them.[12]

This Lease comprises the entire agreement and understanding of the parties; and all prior negotiations, correspondences, proposals, verbal understandings and other prior documents are hereby merged into this Lease, which shall not be amended or modified except by a formal written instrument executed by both parties.[13]

Ms. Hilkene also states that the Lease and an amendment to the Lease were executed by her on behalf of Churchill. She observes that the emails between her and Crestwood or its agents were signed by her, but not explicitly on behalf of Churchill. All of this, she asserts, is evidence that the parties did not agree to conduct transactions via email.[14]

The trial court made the following relevant findings of fact:

Ms. Hilkene created a barrage of email demands and inquiries, directed at Mr. Padon.

Ms. Hilkene complained that Mr. Padon had sent a certified letter, thus wasting time, and stated that she preferred to have all communication made in writing. She established a clear pattern and preference for communicating with Mr. Padon by email.

Both parties agreed to conduct transactions by electronic means. Based on the context and surrounding circumstances,

the parties were in full agreement on their intention to conduct transactions by email.

The trial court also made the following relevant conclusions of law:

The offer conveyed by email, and the acceptance conveyed by certified mail, constituted a valid contract to terminate the lease. The two documents satisfy the requirements of the Statute of Frauds.

The March 17, 2005, email from Ms. Hilkene to Mr. Padon satisfied the requirements of the Uniform Electronic Transactions Act. Ms. Hilkene's email was a valid written offer.

Several pieces of evidence admitted at trial support the trial court's findings and conclusions. In an email Mr. Padon sent to Ms. Hilkene on March 1, 2005, he stated: "Because of the accusations voiced during our meeting last Friday, I would prefer to have my correspondence with you in writing, which unintentionally delayed my response to you because I need to be in my office to email." Ms. Hilkene responded with an email stating: "I prefer not to call you, and have been advised to have all communications with you in writing."

Ms. Hilkene acknowledges this evidence, but claims it only evidences an agreement to communicate or correspond via email. It does not, she asserts, manifest an agreement to conduct transactions via email. In her March 17, 2005 email, sent at 3:50

---

**12.** This provision is located in Article 38.8 of the Lease.

**13.** This provision is located in Article 38.10 of the Lease.

**14.** Ms. Hilkene may be implying that her March 17, 2005, email was not an offer to terminate the contract because such an offer violated the cited provisions of the Lease or because the offer was not signed explicitly by her on behalf of Churchill. The only argu-

ment raised in the point relied on is that the parties did not agree to conduct transactions by electronic means. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Pearson v. Pearson*, 22 S.W.3d 734, 739 n. 4 (Mo.App. W.D.2000) (internal quotation marks and citation omitted). Thus, any argument outside of whether evidence was presented that the parties agreed to conduct transactions through email is not considered.

p.m., Ms. Hilkene stated: "I will be on email only." This is the email in which Ms. Hilkene made the offer to terminate the Lease, which Crestwood subsequently accepted. In this email, Ms. Hilkene makes her offer and states that she is available only through email. By accepting the offer, Crestwood agrees that such an offer, a transaction, may be done through email. This is substantial evidence that the parties agreed to transact business via email.

Section 432.220.2 requires the trial court to examine the "context and surrounding circumstances, including the parties' conduct" in determining whether the parties agreed to conduct transactions by electronic means. As noted above, the parties communicated primarily through email. They explicitly agreed to communicate only in writing. Further, Ms. Hilkene complained when Crestwood communicated with her via a certified letter because the letter took two days to reach her. She demonstrated a preference for email because of its speed. Moreover, she conveyed her offer to terminate the contract via email and stated that she could only be reached through the use of email. The trial court found that this evidence was the manifestation of an intent to conduct business through email. Deference is given to a trial court's findings of fact. *Moore*, 136 S.W.3d at 164. The trial court's findings and conclusions are not error.

Point denied.

### Point IV

 In the fourth point relied on, Churchill and Ms. Hilkene argue that the trial court erred in concluding that the March 17, 2005, email constituted an offer to rescind the Lease between Churchill and Crestwood. They assert that the trial court erroneously applied the law to the facts because the trial court failed to consider whether the surrounding circumstances, the method of communications, and the language used supported its finding. Instead of an offer, they claim that the March 17, 2005, email was an attempt to continue negotiations under the terms of the Lease as illustrated by the surrounding circumstances, the method of communications, and the language used.

Ms. Hilkene argues that the language of the March 17, 2005, email belies its characterization as an offer to terminate the Lease. This is because she stated, "I wish to release myself from the lease" and did not explicitly state an offer to terminate, rescind, or cancel the Lease. She claims that the email indicates her intent to exercise her option not to pay rent or otherwise perform her obligations under the Lease. She also reiterates her argument from Point I, that the email does not state an offer to release Crestwood from the Lease; it only mentions herself. In addition, she notes that the remainder of the March 17, 2005, email discusses fixture placement and signage, thus evincing her intent to occupy the Leased Space.

Further, Ms. Hilkene reiterates her argument from Point III that she expressed no intention to terminate the Lease because, under the terms of the Lease, a termination is required to be a formal writing executed by both parties. She notes that Crestwood required a formal written amendment when it previously amended the Lease and that it executed a formal written termination agreement when the prior tenant, a bookstore, terminated its lease.

Moreover, Ms. Hilkene states that she previously indicated a desire to be released from the Lease if her concerns were not addressed in the comments she wrote on the March 15, 2005, certified letter sent to her by Mr. Padon and then faxed by her to Mr. Padon. Despite asserting this inten-

tion, she continued to negotiate with Crestwood regarding her concerns. This, she claims, indicates that her use of the word "release" was not an offer to terminate the contract and that she intended to continue negotiating, as she had the previous time she used the word "release."

Finally, she argues that, because of her frustration regarding the various problems with the leased Space and because of the mental distress she experienced that resulted from her brother's death, she was not in a good mental state when she wrote the March 17, 2005, email. She argues that the trial court failed to consider these circumstances and her emotional distress.

All of the above, she argues, is evidence that the March 17, 2005, email was not an offer to terminate the Lease. She claims that the trial court failed to consider this evidence and arguments when it found that the email was an offer. The trial court made the following relevant findings of fact:

> On March 14, 2005, in an email to Mr. Padon, Ms. Hilkene made a written request that her rent should not start until "you finish the work that should have been completed before March 1. There were months before where you could have acquired all your bids and done the work...."

> Crestwood and Mr. Padon had not responded to Ms. Hilkene's request to abate her rent obligation, when on March 17, 2005, Ms. Hilkene sent another email to Mr. Padon, containing the following offer:

> I wish to release myself from the lease by March 24th, if the owners can't resolve the issues which cause concern for myself, andy fritzel, and my workers. More specifically the stachybotris present in the space. Also, Andy's schedule will not permit him to do the space after

April 1. I would not have leased the space without his involvement.

> On March 17, 2005, at 3:24 p.m., within the same hour that she emailed to Mr. Padon her desire to be released from the Lease, Ms. Hilkene sent an email to the son of another Crestwood tenant and LLC member, indicating her desire and intention to be released from the Lease. She wrote, in part, "I want out of that f.....g lease.... Luckily, I have enough legal ways to leave. Let them find someone else who will put money into Crestwood like I have...." The manner in which this email was delivered was further evidence of her desire and intent that the message be communicated to the shop owner LLC member. Also in her handwritten response to Mr. Padon's letter of March 15, 2005, Ms. Hilkene wrote: "If there are continued delays ignoring imp. Facts in these letters I can release myself from this lease as of 3–22–05." Ms. Hilkene's clear intention on March 17, was to get out of her Lease obligation for the 301 premises.

> Ms. Hilkene's testimony that she did not intend her email of March 17, 2005, to Mr. Padon, to be an offer to terminate the lease is found to lack credibility. There is credible evidence that she did intend to void the lease, and that it was her clear intention to do so on March 17, 2005, when she sent her email to Mr. Padon.

It also made the following relevant conclusions of law:

> Crestwood could reasonably believe that Ms. Hilkene's email of March 17, 2005, constituted an offer to terminate the Lease if Crestwood could not fulfill her demands by March 24, 2005. They made a timely and valid acceptance of Ms. Hilkene's offer. The acceptance of Ms. Hilkene's offer to terminate the

lease effective March 24, 2005, constitutes a mirror image of her offer. This completed a valid contract.

The offer conveyed by email, and the acceptance conveyed by certified mail, constituted a valid contract to terminate the lease. The two documents satisfy the requirements of the Statute of Frauds.

■■■■ These findings of fact reflect that the trial court considered all of the evidence, including that Ms. Hilkene had previously used the word "release" and that she was seeking a rent abatement, found that she lacked credibility, and determined that it was her intent to offer to terminate the Lease in her March 17, 2005, email.[15] Generally, intent is a question of fact. *Goff v. Case,* 17 S.W.3d 574, 578 (Mo.App. W.D.2000). Deference is given to the trial court's findings regarding witness credibility and the trial court may believe or disbelieve all or part of the witnesses' testimony. *Martin,* 147 S.W.3d at 861; *McRentals, Inc.,* 62 S.W.3d at 696. Deference is also given to a trial court's findings of fact. *Moore,* 136 S.W.3d at 164. The trial court simply did not believe Ms. Hilkene's testimony or evidence that she did not intend to offer to terminate the Lease. This was not error. *See, e.g., Luebbert v. Simmons,* 98 S.W.3d 72, 78–79 (Mo.App. W.D.2003)(In response to woman's argument that she lacked the necessary intent to be bound when signing a promissory note because she was drunk and joking, the appellate court stated that "[t]his was a credibility call" and that the

trial court was free to disbelieve the woman's account of the events.).

Point denied.

### Point V

■■■ In the fifth point relied on, Churchill and Ms. Hilkene argue that the trial court erred in concluding that Crestwood accepted the alleged offer to rescind the Lease. They assert that the trial court erroneously applied the law to the facts because the alleged offer was subject to a condition precedent, which the trial court failed to find had occurred prior to Crestwood's purported acceptance.

■■■ "Under certain circumstances ... a condition precedent can qualify the very existence of a contract, such as when the terms of the offer or a statute impose a condition precedent upon the validity of a contract." *MECO Sys., Inc. v. Dancing Bear Entm't, Inc.,* 42 S.W.3d 794, 803 (Mo. App. S.D.2001). Ms. Hilkene's offer was made with the following language:

> I wish to release myself from the lease by March 24th, if the owners can't resolve the issues which cause concern for myself, andy fritzel, and my workers. More specifically the stachybotris[16] present in the space. Also, Andy's schedule will not permit him to do the space after April 1. I would not have leased the space without his involvement.

The offer was made on March 17, 2005, and Crestwood accepted it on March 18, 2005. Ms. Hilkene now argues that Crestwood could not have accepted the offer

---

15. In the reply brief, Ms. Hilkene argues that the trial court failed to state what "credible evidence" existed in the record to conclude that the March 17, 2005, email was an offer from Churchill to rescind the Lease. Ms. Hilkene does not cite authority for the proposition that the trial court was required to make such a finding. Further, the trial court's findings cite the correspondence between Ms. Hilkene and Mr. Padon and Mr. Miller as evidence of her intent to make such an offer and that such an offer was made.

16. This is the variety of mold found in the basement of the Leased Space.

until March 24, 2005, and only then if the issues of concern had not been resolved. She asserts that the arrival of March 24, 2005, without resolution of the problems, was a condition precedent to the formation of an agreement to terminate the Lease. Ms. Hilkene argues that no evidence was presented that Crestwood could not resolve the mold issue by March 24, 2005. She also claims that the trial court did not make a finding that the condition precedent occurred.[17]

At trial, Mr. Padon testified that the mold was remediated by April 6, 2005. Kaye Miller, one of the three managing partners of Crestwood, testified that when they received Ms. Hilkene's March 17, 2005, offer via email, they discussed it. She stated that "it was absolutely impossible" to complete the mold work by March 24, 2005, and, because of this, Crestwood accepted Ms. Hilkene's offer. She also testified that Crestwood could not meet Ms. Hilkene's conditions because the mold remediation would take ten days to two weeks to complete once a company was hired and that, as of March 17, 2005, Crestwood had not even received all the bids. The trial court made the following relevant findings of fact:

> By March 14, 2005, Mr. Padon still did not have a mold abatement plan in place and was unable to provide a timetable to Ms. Hilkene.
>
> The mold was remediated by April 6, 2005.

The trial court made the following relevant conclusions of law:

> Crestwood could reasonably believe that Ms. Hilkene's email of March 17, 2005, constituted an offer to terminate the Lease if Crestwood could not fulfill her demands by March 24, 2005. They

made a timely and valid acceptance of Ms. Hilkene's offer. The acceptance of Ms. Hilkene's offer to terminate the lease effective March 24, 2005, constitutes a mirror image of her offer. This completed a valid contract.

The judgment also contained the following:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Commercial Lease between Crestwood Shops, L.L.C. and Sally S. Hilkene and Churchill's in Crestwood was validly terminated, effective March 24, 2005.

The evidence was that Crestwood was unable to remediate the mold by March 24, 2005. The mold was not actually remediated until April 6, 2005. Because of the inability of Crestwood to remediate the mold by March 24, 2005, Crestwood accepted the offer. The trial court recognized the existence of the condition precedent and decreed that the Lease was terminated effective March 24, 2005, the date set by Ms. Hilkene. Implicit in the judgment, the trial court found that the condition precedent did not occur. If it had, there would not have been an agreement to terminate the Lease.

▮▮▮▮ Ms. Hilkene further argues that her offer did not require that the mold be abated by March 24, 2005. Instead, it required that the mold be "resolved" by that date, meaning that a plan of action be in place by that date. Interpretation of a contract is a question of law and is subject to *de novo* review. *Local 781 Int'l. Ass'n of Firefighters,* 996 S.W.2d at 115. Ms. Hilkene and Mr. Padon exchanged several emails. In these, Ms. Padon informed Ms. Hilkene that he was in the process of obtaining bids and could not develop a timetable until all bids were

---

17. Ms. Hilkene argues that a finding was required in the judgment that the mold issue could not be resolved before March 24, 2005. She cites no authority requiring such a finding, however.

received. In a March 14, 2005, email to Mr. Padon, Ms. Hilkene made a written request that her rent should not start until "you finish the work that should have been completed before March 1. There were months before where you could have acquired all your bids and done the work...." In this email, she was requesting the work to be completed, not that a plan of action be initiated. Also in these emails, Ms. Hilkene informed Ms. Padon that her contractor could not do the remodeling work after April 1 and that she would not have leased the additional space if she knew she would have to use another contractor. Given this, a reasonable interpretation of the word "resolve" is that Ms. Hilkene wanted to terminate the Lease if the mold was not abated by March 24, 2005, so that she could begin remodeling on that date. The trial court interpreted the word this way, evidenced by its judgment, and so does this court. Further, even if the word resolve were ambiguous, it would be construed against Ms. Hilkene, the drafter. *Byrd v. Frank B. Wilson Trust,* 182 S.W.3d 701, 706 (Mo.App. W.D. 2006).

Point denied

## Conclusion

All of Ms. Hilkene and Churchill's points are denied, and the judgment is affirmed.

All concur.