

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

JAMES SMITH, )
)
    Appellant-Respondent, )
)
REMAX PROFESSIONALS OF )
ST. JOSEPH, INC., )
)
    Respondent, )
)
vs. ) WD82023 (Consolidated with WD82080)
)
) Opinion filed: October 1, 2019
MOHAMMAD NAJAFI and )
HOMA NAJAFI, )
)
    Respondent-Appellants. )

### APPEAL FROM THE CIRCUIT COURT OF BUCHANAN COUNTY, MISSOURI
### THE HONORABLE DANIEL F. KELLOGG, JUDGE

Before Division One: Cynthia L. Martin, Presiding Judge,
Victor C. Howard, Judge and Alok Ahuja, Judge

James Smith (plaintiff) and Mohammad and Homa Najafi (defendants) appeal the

judgment of the Buchanan County Circuit Court. The court determined that Smith was entitled to

specific performance of a contract for the sale of real property and damages. Smith claims on

appeal that he was entitled to damages due to the increase in interest rates available to complete

the sale of the real property. We agree and modify the judgment pursuant to Rule 84.14. The

Najafis claim in two points on appeal that the trial court erred in finding a contract between the

parties. Those points are denied. The judgment is affirmed as modified. Further, the case is remanded to the trial court for determination of reasonable attorneys' fees on appeal.

## Facts[1]

On October 16, 2017, James Smith filed a petition in Buchanan County Circuit Court against Mohammad and Homa Najafi. It alleged that Smith and the Najafis entered into a contract for Smith to purchase real property from the Najafis and that the Najafis failed to convey the real property. The petition sought specific performance and damages for breach of contract. ReMax Professionals of St. Joseph ("ReMax") filed a motion for joinder. ReMax had filed suit against the Najafis on October 18, 2017, for the real estate commissions earned pursuant to the contract between Smith and the Najafis and pursuant to a prior contract. The cases were joined for trial on February 16, 2018.

The matter proceeded to a bench trial. The trial court found the following: The Najafis entered into an Exclusive Right to Sell Listing Contract with ReMax for certain real property ("the Property") on April 22, 2017. This contract provided that the listing agent would be entitled to a real estate commission of 6%. On April 30, 2017, Curtis Walker made an offer to purchase the Property. This offer was rejected by the Najafis by way of a counter-offer. The counter-offer included a sale price of $138,000. Walker accepted the counter-offer on May 3, 2017. The Najafis refused to close on the sale.

On August 25, 2017, James Smith[2] made an offer to purchase the Property. Again, the Najafis rejected Smith's offer by way of counter-offer. The counter-offer, which included a sale price of $138,000, was accepted by Smith on August 31, 2017, and closing was set for September

---

[1] Much of the recitation of facts comes directly from the trial court's judgment without further attribution.
[2] James Smith is married to Megan Smith. James Smith was the only person who signed the contract for purchase of the Property. His wife is not a party to or an Appellant in this case.

2

27, 2017.  The Najafis were informed of the closing date.  At no time did they inform their agent or anyone else they did not believe a contract for sale had been agreed upon.  The only mention was Mrs. Najafi's concern that "this price is too low."

Smith and his wife obtained the necessary financing and had the funds delivered to the closing company on the closing date.  The Najafis indicated they would execute the documents and have them delivered via FedEx to the title company.  The Najafis failed to do so.  The Najafis later agreed to come to St. Joseph personally on a weekend to close the sale.  They again failed to do so.

Relying on the Najafis' representations, Smith gained access to the Property to begin making improvements.  At the time of the original closing date, the interest rate Smith had locked in was 4.375%.  The best interest rate available to Smith as of the date of trial was 5%.  Smith incurred costs and legal fees associated with the purchase of the Property in the amount of $19,247.00.  ReMax incurred costs and fees in the amount of $6,011.25.

The trial court found that ReMax was entitled to two commissions for $8,280.00 each for a total of $16,560.00 for commissions earned upon procurement of a buyer on two separate occasions.  The court also awarded ReMax attorneys' fees and costs in the respective amounts of $5,860 and $151.25.  The court found in favor of Smith and ordered specific performance of the contract for the sale of the Property.  It further found that Smith incurred damages in the amount of $450.00 for a new appraisal and attorneys' fees pursuant to the contract in the amount of $10,247 for a total of $10,697.

These appeals follow.[3]

---

[3] ReMax did not file a brief in this case.

**Standard of Review**

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *ROH Farms, LLC v. Cook*, 572 S.W.3d 121, 125 (Mo. App. W.D. 2019) (internal quotation marks omitted). "Appellate courts accept as true the evidence and inferences ... favorable to the trial court's decree and disregard all contrary evidence." *Id*. (internal quotation marks omitted). "Circuit courts are free to believe any, all, or none of the evidence presented at trial." *Id*. (internal quotation marks omitted). "Deference is ... given to the trial court's findings of fact." *Id*. (internal quotation marks omitted).

"Specific performance is purely an equitable remedy and must be governed by equitable principles." *Id*. "The equitable remedy of specific performance is not a matter of right but is a remedy applied by courts of equity, depending upon the facts in the particular case; and the trial court has judicial discretion within the established doctrines and principles of equity to award or withhold the remedy." *Id*. (internal quotation marks omitted). "Specific performance is purely an equitable remedy which is invoked primarily that complete justice may be done between the parties, and courts of equity will not decree specific performance where it will result in injustices." *Id*. (internal quotation marks omitted).

**Smith Point I**

In his sole point on appeal, Smith claims the trial court erred in not awarding damages due to increased interest rates. He argues that an increase in interest rate was directly related to the Najafis failure to perform. Smith states that the best interest rate available to Smith for the purchase loan on the original closing date was 4.375%, and the best interest rate available to Smith at the time of trial was 5.000%.

"Where a trial court awards a decree of specific performance to a purchaser of land, inevitably a period of time elapses between the date when the land should have been conveyed in fulfillment of the contract and the date of the decree ordering the performance." *McDermott v. Burpo*, 663 S.W.2d 256, 263 (Mo. App. W.D. 1983). "As incident to its decree, the trial court has the discretion to relate performance to the original date of the agreement through an additional award of any costs caused by the delay." *Id.* "This award does not arise as legal damages from the breach of the contract; rather, it is more in the nature of an equitable accounting between the parties in affirmance of the contract." *Id.* This includes compensating a non-breaching buyer for the increase in interest rates in addition to granting specific performance. *Id.* (citing *Cal-Val Construction Co., Inc. v. Mazur,* 636 S.W.2d 391 (Mo. App. E.D. 1982)).

In addition to ordering specific performance, the trial court awarded Smith the cost of a new appraisal to complete the purchase of the Property. Further, the trial court specifically found that the interest rate Smith had locked in at the time of closing was 4.375%. It also found that the best interest rate available to Smith as of the date of trial was 5%. It did not award Smith damages stemming from the change in interest rate, however.

In their respondent's brief, the Najafis argue that the witness who testified about interest rates at the time of the scheduled closing and the time of trial should not have been allowed to testify about those things. They claim the testimony was received into evidence without a sufficient foundation for an expert opinion, that the witness could not identify his methods, and that the witness relied on documents prepared by a company rather than by himself.

Dennis Lichens testified at trial. He worked for the mortgage company Smith went through to obtain a mortgage to buy the Property. At the time of trial he worked for a different lending partner. He testified Smith was fully approved for a loan to facilitate the purchase of the Property.

5

Exhibit 6, a conditional commitment from the mortgage company, was introduced into evidence at trial without objection. The loan had a fixed interest rate of 4.375%.

Lichens generally works in home loans. He testified that since the closing date of the property interest rated have increased steadily. The Federal Reserve Bank has raised rates twice since then and people projected a couple more raises by the end of the year during which trial was occurring. Lichens stated that if Smith entered into a loan commitment at the time of trial his interest rate "would be in the high 4's to 5, again paralleling a 95 percent loan to value and the profile we had at the time for no points, no extra fees." He further testified they would need a new appraisal at a cost of $450 to $500.

Exhibit 5 was a mortgage calculation for the Property with an interest rate of 4.375%. The second page was a similar calculation only with an interest rate of 5%. The total amount paid over the 30 year life of the mortgage under the 5% calculation was $17,700 more than the total amount paid under the 4.375% calculation. The monthly payment was almost $50 more per month under the 5% calculation.

Lichens testified that if a person took out a loan at the time of trial for $9,166.95 with a 30 year loan life and interest rate of 5% that the total amount paid under the loan would be $17,715.66. Further, the initial loan was for $131,100. If $9,166.95 was deducted from the initial principal amount then the loan would be for $121,933.05. If a 30 year loan for $121,933.05 was taken out at a 5% interest rate then the total amount paid under the loan would be $235,642.67. Under the original loan commitment, Smith was to borrow $131,100 at 4.375% over 30 years; the total paid would have been $235,642.67. Thus, an initial payment of $9,166.95 applied to the principal of Smith's loan at a 5% interest rate would put Smith in exactly the same position as if the loan had been at 4.375%.

6

After all of this testimony was heard, Smith's attorney sought to admit Exhibit 5 into evidence. For the first time, counsel for the Najafis objected:

Counsel for Najafis: I'm going to object, Your Honor. This actually calls for speculation. All of these scenarios, what ifs, are based on assumptions about future interest rates, terms of loan, the absence of refinancing in future years. So this is all speculative and not sufficiently precise to be admitted into evidence. And I would submit, with respect to that, a decision -- I have copies here somewhere. Catroppa vs. Metal Buildings Supply, Inc., Missouri Court of Appeals Southern District, 267 S.W.3rd 812, which discusses the insufficient foundation and speculative nature of evidence not specifically admissible to prove damages in this type of contract controversy.

…

Counsel for Smith: Well, I believe he testified of the knowledge of what the term -- what the rate was, what the rate would be currently. He has that knowledge from his – we've laid the foundation of his knowledge based on his experience as a loan underwriter. As far as being speculative in nature, it is what the best interest rate available is to the Smiths at this time compared to what the interest rate was at the time of closing. As far as any speculative nature interest rates going up or down, that's defendant's -– or the burden of -- that isn't speculative. We're not asking for if the interest rates are going to continue to go up.

The court overruled the objection. On cross-examination, counsel for the Najafis focused on how Lichens depends on the opinions of others and the actions of the Federal Reserve Bank to evaluate future interest rates. Cross examination also focused on the fact that the company Lichens worked for generated the exhibits outlining the loan over the course of 30 years. Lichens testified the documents were prepared with his input. When asked if he could "explain the process of calculating the net present value of a stream of future installment payments" Lichens said he could not. [4]

Because the Najafis' counsel did not object until after Lichens had already testified concerning the amount in current dollars that would be necessary to compensate Smith for the

---

[4] Exhibit 5 is not in this court's legal file for this appeal. Moreover, the Najafis did not present any evidence at trial about interest rates.

7

higher interest rate, we question whether they have preserved their argument that Lichens' testimony was inadmissible. *See*, *e.g.*, *Andrews v. Andrews*, 452 S.W.3d 150, 154 (Mo. App. W.D. 2015) ("[f]ailure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of claim" (internal quotation marks omitted)). "Generally in Missouri, expert testimony is only required when a fact at issue is so technical or complex that no fact-finder could resolve the issue without it." *Penzel Constr. Co., Inc. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 228 (Mo. App. E.D. 2017) (internal quotation marks omitted). "Even if expert testimony is not *required*, it is *admissible* when the topic at issue is one with which lay witnesses and fact-finders are unfamiliar." *Id*. at 229 (internal quotation marks omitted). "We allow expert testimony to address issues in areas in which the fact-finder lacks experience or knowledge." *Id*.

"For a witness to qualify as an expert under § 490.065, it must be shown that due to the witness's education or specialized experience, he possesses superior knowledge on a subject that persons without such education or experience would be incapable of forming an accurate opinion or drawing correct conclusions." *Id*. (internal quotation marks omitted). "As long as the witness has *some* qualifications, the testimony may be permitted." *Id*. "The depth and breadth of experts' experience and knowledge are pertinent to the weight to be accorded their testimony, not to the admissibility of their opinion." *Id*. (internal quotation marks omitted).

Lichens was the loan officer assigned to the mortgage for the original closing date of the Property. He certainly knew the terms of that loan. Moreover, he was still working in the mortgage industry at the time of trial and was familiar with interest rates at that time. Finally, he was familiar with how a principal amount would be paid over the course of a specific number of years at a specified interest rate in contracts like home mortgages. As discussed, *supra*, any weakness in his testimony goes to the weight afforded to his testimony and not its admissibility. *See id*.

At trial, counsel for the Najafis objected alleging that the calculations were "based on assumptions about future interest rates, terms of loan, [and] the absence of refinancing in future years." Lichens testified that the calculations were based on interest rates at the time of trial and not future possible interest rates. Moreover, he testified that the terms of the loan projections were the same for the projection at the time the sale of the Property was supposed to close and for the projection based on interest rates at the time of trial. Finally, refinancing at a future date was not a factor in either projection. The trial court did not err in allowing Lichens to testify and in admitting Exhibit 5.[5]

*Cal-Val Construction Co.,* 636 S.W.2d 391, "stands as the first Missouri case to consider whether to compensate the non-breaching party for an increase in interest rates in addition to granting specific performance." *McDermott*, 663 S.W.2d at 263. The court in *McDermott* clarified that "[r]ecovery for the interest rate differential on real estate loans has been computed as the difference between the interest rate the Buyer had committed to him as of the date of closing and the most favorable interest rate available at the time of the judgment, computed over the life of the contract, and discounted to its present value." *Id*. at 264. In so doing, it favorably cited cases from other states that found an abuse of discretion when the trial court did not award such damages. *See Rekhi v. Olason*, 626 P.2d 513, 517 (Wash. Ct. App. 1981) ("[T]he trial court, in view of its unchallenged finding that $3,500 in damages occurred because of the delay, abused its discretion in refusing to allow compensation for the loss solely because the property value had increased. The increased value belonged to the purchasers, and would have inured to them had performance

---

[5] We also note that the Missouri Supreme Court has held that, "because [a] jury [is] capable of making a present value reduction without aid of expert testimony, . . . [a] plaintiff [is] not required to present evidence of present value as part of plaintiff's evidence of future damages." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 762 (Mo. banc 2010). Therefore, whether or not Lichens was qualified to testify concerning his calculation of the present value of Smith's interest-rate-related damages, the circuit court had sufficient evidence before it to make that calculation on its own.

been timely."); *Walker v. Benton*, 407 So. 2d 305, 308 (Fla. Dist. Ct. App. 1981) ("The court, however, in order to return the parties to their relative positions, should assess as damages the difference in total interest payments under a mortgage loan at the terms of the expired FHA commitment and a mortgage loan under the current interest rate.").

The same is true in this case. Having found that Smith will incur a higher interest rate with his mortgage because of the Najafis' failure to close on the sale, the trial court should have awarded Smith an additional $9,166.95 to compensate for the increased interest rate.

The point is granted.

### Najafi Point I

In their first point on appeal, the Najafis claim the trial court erred in finding that a contract had been formed between the Najafis and Smith for the sale of real property. They argue that none of the counter-offers had been accepted by all parties. The Najafis conclude that it was reversible error to enter a judgment for specific performance.

James Smith was the buyer. His wife is Megan Smith. Their real estate agent was Brandon Sale. Mr. and Mrs. Najafi were the sellers. Their real estate agent was Mary Kay Lyle. All of these parties testified at trial. As found by the trial court and supported by the evidence at trial, the following occurred with the real estate contract:

James Smith made an offer to purchase the Property. Lyle passed the offer to the Najafis. In response, Mr. Najafi added several handwritten terms to paragraph 22. He initialed those changes with "MN" (Mohammed Najafi) in two places. Mr. Najafi testified that he initialed the changes with "MN" on behalf of himself and his wife. He sent the changes to Lyle. She called Mr. Najafi and advised him that he should take out the terms he added. Mr. Najafi was out of town; he told Lyle to send the contract to his wife and have her initial it.

10

The handwritten terms were subsequently crossed out. One of the "MN" (Mohammed Najafi) initials that appeared at the end of a handwritten sentence was also crossed out. The other initial was not crossed out. In addition to the crossing out, the initials "HN" (Homa Najafi) were added as well at the date "8,31,17." Mrs. Najafi could not say whether she was the person who struck out the handwritten terms. She testified that she wrote her initials and the date. Mrs. Najafi testified that she followed her husband's instructions when it came to selling the Property. He told her it was okay to sign the contract and send it back to Lyle.

Lyle testified that she communicated her concerns about the handwritten additions in paragraph 22 to the Najafis. Because of that, the Najafis "marked out what they'd written and initialed it" and sent it back to her. She forwarded the document to the real estate agent for the Smiths.

At this point, paragraph 22 had handwritten terms added and crossed out. The paragraph is initialed by both Najafis and dated. This is the document, the counter-offer, Lyle sent to Brandon Sale who was the real estate agent for the Smiths. The handwritten interlineations in paragraph 22 were acceptable to the Smiths, so the Smiths initialed and dated them.

This version of the contract proceeded to closing. Lyle testified that after all parties initialed paragraph 22 that she believed everything was in order to close on the sale of the Property.

In their first point on appeal, the Najafis argue that none of the counter-offers were accepted by all parties. As best as we can ascertain, Mr. Najafi argues that since he never initialed the crossing out of the handwritten terms that he never accepted the crossing out of the handwritten terms. Mr. Najafi is essentially arguing that he never accepted the counter-offer that he and his wife made. Thus, he claims a contract was never formed.

11

The Najafis rely on *Pride v. Lewis*, 179 S.W.3d 375 (Mo. App. W.D. 2005) for the proposition that no contract existed because a counter-offer was not accepted by all parties. "Before a plaintiff can establish a breach of contract, he or she must first establish the existence of a contract." *Pride*, 179 S.W.3d at 379. "A contract does not exist without a definite offer and a 'mirror-image' acceptance." *Id.* (internal quotation marks omitted). "Any acceptance that includes new or variant terms from the offer presented amounts to a counter-offer and a rejection of the original offer." *Id.* "The unequivocal acceptance of the offer is fundamental to the existence of a contract." *Id.*

In the current case, Smith made an offer. The Najafis rejected that offer by way of counter offer. Mr. Najafi added some terms to paragraph 22 on behalf of himself and his wife. He sent that document to his real estate agent. That counter-offer was never presented to Smith or Smith's real estate agent.

After speaking with his real estate agent, Mr. Najafi and his wife crossed out the handwritten terms. At trial, Mr. Najafi claimed he did not know that the handwritten terms were crossed out. Lyle, his real estate agent, testified that she spoke with Mr. Najafi about removing the terms, he agreed, and he asked Lyle to contact his wife to make the changes because he was out of town. His wife testified that she added her initials and the date to paragraph 22. She could not say whether she was the person who crossed out the terms in paragraph 22. Mrs. Najafi testified that she followed her husband's directions with respect to the sale of the Property. In the light most favorable to the judgment, sufficient evidence was presented that Mr. and Mrs. Najafi presented to Smith a counter-offer they both agreed on – the one where the handwritten terms in paragraph 22 were crossed out. Smith accepted the offer, consideration was present, and a contract was formed.

12

The Najafis seems to argue that *Pride* holds that all handwritten parts of a contract must be initialed by all parties. That is a misinterpretation. In *Pride*, a buyer of real estate presented the sellers with an offer. *Id.* at 377. The sellers rejected the offer. *Id.* The buyer presented the seller with a second offer; this offer was already signed by the buyer. *Id.* The sellers changed the closing date in the offer by hand and signed the contract. *Id.* The buyer never initialed this change. *Id.* On appeal to this court, the sellers acknowledged that their changing the closing date was a counter-offer. *Id.* at 379. At the time they did that, the parties did not all have a meeting of the minds. The buyer offered A and the sellers accepted B. The fact that the buyer did not initial the change in closing date was important because the buyer never accepted B.

The current case is distinguishable. Smith offered A, the Najafis counter-offered B, and Smith accepted B. This is not a case where the addition of a term not included in the offer destroyed the mirror-image acceptance needed for a contract to form. *See Reppy v. Winters*, 351 S.W.3d 717, 721–22 (Mo. App. W.D. 2011) ("Because Winters's June 12, 2007 letter, by its plain language, added to Reppy's original offer a term requiring Reppy's counsel to indemnify Winters, his insurer, and his attorney for any type of lien, it was not a mirror image of the original offer and was not an unequivocal acceptance."); *compare Crestwood Shops, L.L.C. v. Hilkene*, 197 S.W.3d 641, 650 (Mo. App. W.D. 2006) (finding that when a party accepted an offer the party restated the offer and clarified the effect of the contract so that the party's acceptance was a valid acceptance and not a counter-offer).

The Najafis cite no authority, and we find none, for the proposition that all handwritten parts of a contract must be initialed by all parties in order for a contract to exist.[6] The trial court

---

[6] We note that contracts can exist that are made up of handwritten portions and typed portions. *See, e.g., Century 21– Andrews Realty, Inc. v. Adams,* 691 S.W.2d 511, 512 (Mo. App. W.D. 1985) ("The rule is well established that where the printed portions of a contract conflict with handwritten provisions or interlineations, the latter prevail.").

found that the Najafis made a counter-offer to Smith, and he accepted it. This finding is supported by the evidence at trial.

The point is denied.

## Najafi Point II

In their second point on appeal, the Najafis claim the trial court erred in finding that the Najafis entered into an Exclusive Right to Sell Listing Contract with ReMax. They argue that no contract was formed because the Najafis' manual counter-offer was not accepted by ReMax. The Najafis conclude it was reversible error to enter a judgment in favor of ReMax for damages and attorneys' fees.

The argument portion of the Najafis' brief for this point is one page long. It contains no citations to statutes, cases, or any other authority. They argue that insufficient evidence was presented that a contract existed between themselves and ReMax.

Exhibit 1A was entered into evidence without objection. It is a document titled "Seller's Agency Listing Contract (Exclusive Right to Sell)." It is a typed document with multiple blanks that have been filled in with handwritten terms. All of the blanks that have been filled in have been initialed by both Mr. and Mrs. Najafi. Similar to their first point, the Najafis' seem to argue that all handwritten terms must be initialed by all parties and that a contract does not exist since no person initialed the blanks on behalf of ReMax. As discussed *supra*, there is no authority for the proposition that all handwritten terms in a contract must be initialed by all parties in order for a contract to exist.

Mr. Najafi's signature is dated April 19, 2017. Mrs. Najafi's signature is dated April 20, 2019. Lyle's signature is dated April 22, 2017. The designated broker for ReMax's signature is dated April 22, 2017. Thus, this is not a situation where ReMax made an offer, the Najafis made

14

a counter-offer by adding handwritten terms, and then ReMax never accepted the counter-offer. Instead, the Najafis signed the contract first and then ReMax signed after the Najafis.

Lyle testified about who signed the contract and on what date. Her testimony matched the dates on the contract. She testified that as of April 22, 2017, there was a listing agreement for the Property for sale exclusively with ReMax. The sellers' listing contract was to last through September 30, 2017. The contract provided that if a willing and prudent buyer is procured by the realtor during the listing period then the owners shall pay 6% of the sales price to the realtor. That provision was initialed by Mr. and Mrs. Najafi. The contract further provided that ReMax could recover its attorneys' fees.

Mr. Najafi testified in relevant part:

Smith's Attorney: And I believe the evidence showed that you entered into a listing agreement with Mrs. Lyle in April of 2017?

Mr. Najafi: A. Yes.

Smith's Attorney: Did you talk with Mrs. Lyle about the value of the home?

Mr. Najafi: Yes, I did.

Smith's Attorney: Did you come up with a listing price?

Mr. Najafi: She set it.

Mr. Najafi testified that Lyle did not communicate effectively with him. This testimony also acknowledged the existence of a contract with ReMax:

ReMax's Attorney: But your criticism of Mary Kay is that she didn't communicate with you?

Mr. Najafi: No. I said after the certain date, she did not.

ReMax's Attorney: Okay. What date was that?

Mr. Najafi: I believe after the contract –

15

ReMax's Attorney: It was the end of October, wasn't it?

Mr. Najafi: Some of my texts she did not answer. She didn't respond. That was after October 23rd, this is my text. She never respond to it.

ReMax's Attorney: So she responded up through the termination of the listing contract?

Mr. Najafi: She -- she -- actually, according to this document, October 10.

ReMax's Attorney: Okay. Do you know when the listing contract expired?

Mr. Najafi: It was September 30.

Sufficient evidence was presented at trial that the Najafis had a contract with ReMax pursuant to which they were required to pay 6% of the sales price for any willing and prudent buyer.

The point is denied.

## Attorneys' Fees on Appeal

Prior to submission of this case, Smith moved for appellate attorneys' fees. The contract for the sale of the Property contains an attorneys' fee provision, granting attorneys' fees to the prevailing party for disputes arising from the contract. Because we affirm that Smith was the prevailing party at trial, we conclude that Smith is the prevailing party on appeal under the contract. Accordingly, Smith is entitled to an award of reasonable appellate attorneys' fees.

"Although appellate courts have the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Parkway Constr. Servs., Inc. v. Blackline LLC*, 573 S.W.3d 652, 672 (Mo. App. E.D. 2019) (internal quotation marks omitted). "We therefore remand the case to the trial court for an award of reasonable attorneys' fees for this appeal." *Id*.

16

**Conclusion**

Rule 84.14 permits this court to "give such judgment as the court ought to give." In addition to ordering the parties to comply with the Contract for Sale in the amount of $138,000.00, the trial court ordered that Smith recover from the Najafis the total sum of $10,697.00, which may be deducted from the sale of the proceeds advanced to the Najafis. The judgment is modified to add $9,166.95 to the damages awarded Smith. Thus, Smith is awarded a total sum of $19,863.95, which may be deducted from the amount of sale proceeds advanced to the Najafis. The judgment is affirmed as modified. Further, the case is remanded to the trial court for determination of Smith's reasonable attorneys' fees on appeal.

VICTOR C. HOWARD, JUDGE

All concur.

17